UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| DIEGO CERVANTES Individually and on Behalf of the Invesco 401(k) Plan and All Others Similarly Situated, | Civil Action No. _____ |
| | |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | COMPLAINT FOR LIABILITY UNDER ERISA |
| INVESCO HOLDING COMPANY (US), INC.; INVESCO LTD.; INVESCO NATIONAL TRUST COMPANY; INVESCO ADVISERS, INC.; INVESCO POWERSHARES CAPITAL MANAGEMENT LLC; INVESCO BENEFITS PLAN COMMITTEE; INVESCO BOARD OF DIRECTORS; INVESCO BOARD OF DIRECTORS COMPENSATION COMMITTEE; SARAH E BESHAR; JOSEPH CANION; MARTIN L. FLANAGAN; ROBERT HENRISKSON; BEN F. JOHNSON, III; DENIS KESSLER; SIR NIGEL SHEINWALD; G. RICHARD WAGONER, JR.; PHOEBE A. WOOD; SUZANNE CHRISTENSEN; JOHN COLEMAN; WASHINGTON DENDER; PETER GALLAGHER; DAVID GENOVA; DOUGLAS SHARP; BEN UTT; GARY WENDLER; and JOHN DOES 1-20; | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ..................................................................1

JURISDICTION AND VENUE ............................................................4

PARTIES.................................................................................................5

   Plaintiff ...........................................................................................5

   Defendants ......................................................................................5

         The Invesco Plan Sponsor Defendants .......................................5

         The Invesco Benefits Committee Defendants ............................6

         The Board of Directors Defendants ...........................................8

         The Investment Manager Defendants .......................................10

         The Plan ....................................................................................11

         The "Doe" Defendants ..............................................................11

   Defendants' Fiduciary Duties Under ERISA...........................................12

   The Duties of Loyalty and Prudence ............................................12

      Fiduciaries Are Required Under ERISA to Act in the Best
      interest of Plan Participants When Selecting and
      Maintaining Investment Options ..............................................15

   Co-Fiduciary Liability ..................................................................16

   Substantive Allegations...................................................................17

   The Plan .........................................................................................17

      The Plan Offered Too Many Investment Options and Nearly All
      Investment Options Were Affiliated with Invesco ..................18

**Page**

Defendants Failed to Use Their Leverage as One of the Larger Defined Benefit Plans in the United States to Reduce Costs for the Benefit of Plan Participants ..................................24

The Plan fiduciaries Breached their Fiduciary Duties by Offering Imprudent Affiliated ETF Investment Products to Plan Participants. ..................................................................27

The Plan Offered Worse Performing Retail Shares Instead of Better Performing Institutional Shares ....................................31

The Plan Fiduciaries Added Poorly Performing Proprietary Mutual Funds to the Plan ..........................................................34

The Plan Fiduciaries Breached their Fiduciary Duties by Offering Imprudent Invesco Target Date Funds with High Expenses and Poor Performance....................................39

The Plan Fiduciaries Breached Their Fiduciary Duties in Connection with the Collective Investment Trusts Offered by the Plan ..................................................................43

The Invesco 500 Index Trust Fund ...........................................44

The Invesco Mid Cap Growth Trust .........................................45

The Invesco Diversified Dividend Trust ...................................47

The Plan Fiduciaries Breached Their Fiduciary Duties in Connection with the ISTF.........................................................48

CLASS ACTION ALLEGATIONS ........................................................................50

COUNT I ..................................................................................................................52

Page

Breach of Fiduciary Duties in Violation of ERISA §404(a) Against the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants ..............................................52

COUNT II ...................................................................................................57

Prohibited Transactions in Violation of ERISA §406(a)(1) (A), (C) and (D)  Against the Invesco Plan Sponsor Defendants, Benefits Committee Defendants and Investment Manager Defendants ..............................................57

COUNT III ...................................................................................................60

Prohibited Transactions in Violation of ERISA §406(b)(1) and (3)  Against the Invesco Plan Sponsor Defendants, Benefits Committee Defendants, and Investment Manager Defendants ..............................................60

COUNT IV ...................................................................................................64

Breaches of Fiduciary Duties of Prudence and Loyalty in Violation of ERISA §404(a)  Against the Board of Directors Defendants ..............................................64

COUNT V ...................................................................................................67

Co-fiduciary Liability Under ERISA §405  Against the Invesco Plan Sponsor Defendants, the Benefits Committee Defendants, the Board of Directors Defendants, and the Investment Manager Defendants ..............................................67

COUNT VI ...................................................................................................69

Knowing Participation in a Fiduciary Breach or  Violation of ERISA Pursuant to ERISA 502(a)(3)  Against Defendant Invesco and The Investment Manager Defendants ..................69

**Page**

ENTITLEMENT TO RELIEF ....................................................................71

PRAYER FOR RELIEF ..........................................................................71

Plaintiff brings this action individually, on behalf of a class of all participants in Invesco Ltd.'s 401(k) Plan (the "Plan") between May 25, 2012 to the date of Judgment (the "Class Period"), and on behalf of the Plan, for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, et seq. ("ERISA"), against the Defendants, as defined below.  As alleged herein, Defendants have breached their fiduciary duties of prudence and loyalty with respect to the Plan, and entered into prohibited transactions in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.

## NATURE OF THE ACTION

1.     Invesco Ltd. ("Invesco") is an investment management firm that offers mutual funds and other types of investment products to customers.  Invesco offers the Plan to its thousands of employees.  ERISA, which regulates the operation of the Plan, requires plan fiduciaries to act solely in the interest of the Plan's participants and beneficiaries.  To meet their fiduciary obligations, the Plan fiduciaries are required to establish and maintain a prudent process to search the market for the best investment options for Plan participants and to monitor the Plan's investment options on an ongoing basis.

2.     Defendants did not consider or act in the best interest of the Plan and its participants throughout the Class Period.  Instead, Defendants put their interests before the Plan participants by treating the Plan as an opportunity to promote and generate fees from proprietary investment products offered by Invesco and its subsidiaries.

3.     During the Class Period, Invesco and the other defendants used Plan participants as a captive market for Invesco's proprietary investment products to benefit Invesco.  Instead of engaging in a prudent process to find the best investment options for the Plan, Defendants simply loaded it with Invesco proprietary investment options.  During the Class Period, between 93% to 95% of the Plan's investment options were affiliated with Invesco.  Many of the Plan's investment options performed worse and/or had higher fees than other comparable unaffiliated investment options.

4.     The utter lack of a prudent process followed by Defendants is also shown by the large number and type of investment options offered in the Plan.  Even though the typical 401(k) plan offers between 10 to 15 investments the Plan had approximately 150 to 205 options during the Class Period.  Defendants indiscriminately dumped Invesco mutual funds, ETFs, and other investment products into the Plan in breach of their fiduciary duties.  The large number of options made

their selection by Plan participants confusing, especially since the Plan offered multiple share classes (with different fees and performance results) of numerous funds. Furthermore, several investment options exposed Plan participants to an undisclosed liquidity risk as a result of their investments in another proprietary Invesco fund named the Invesco Short Term Investment Fund ("ISTF"), which was fined $10 million by the U.S. Department of Labor for inappropriately using fund assets to artificially inflate the net asset value of that fund.

5.     As alleged below, Defendants acted in their own interests to the detriment of Plan participants. Instead of carefully examining and selecting the most prudent investment options for the Plan or prudently monitoring the Plan to eliminate its poor investment options, Defendants caused the Plan to offer almost exclusively Invesco affiliated mutual funds, collective trusts, and ETFs enabling Invesco and its subsidiaries to earn lucrative fees and to increase its assets under management.

6.     To remedy these fiduciary breaches and prohibited transactions, Plaintiff, individually and as representatives of a Class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan to recover all losses resulting from Defendants' breaches of fiduciary duty and other ERISA violations and restore to the Plan any profits made by the fiduciaries or the persons and/or entities who knowingly participated in the fiduciaries' imprudent and disloyal use of Plan assets. In addition,

Plaintiff seeks such other equitable or remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

7.     Plaintiff brings this action pursuant to 29 U.S.C.§ 132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of a plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and it has exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

9.     Venue is proper is this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was and is administered in Atlanta, Georgia within this District, violations of ERISA took place in this District, and/or a defendant resides or may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiff**

10.     Plaintiff Diego Cervantes has been a Plan participant during the Class Period and was invested in Investment Options affiliated with Invesco, including Investment Options that invested in the ISTF.

11.     Plaintiff Cervantes has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the fees and expenses generated as a result of Plaintiff Cervantes' Plan investments.

**Defendants**

**The Invesco Plan Sponsor Defendants**

12.     Defendant Invesco Holding Company (US) Inc., formerly known as IVZ, Inc. ("IVZ") is a Delaware corporation and the named Plan Sponsor in the Plan Document.

13.     Defendant Invesco is an investment management company headquartered in Atlanta, Georgia.  Defendant Invesco operates its for-profit investment management business through its wholly owned subsidiaries, Invesco Advisers Inc. ("Invesco Advisers"), Invesco National Trust Company ("Invesco Trust Co."), and PowerShares Capital Management LLC ("Powershares").  Defendant Invesco serves as the Plan

Sponsor within the meaning of ERISA §3(16)(B), 29 U.S.C. §1002(16)(B) because it is the parent employer of the controlled group of Invesco subsidiaries that offer the Plan to its employees.

14.     According to the Plan Documents, the Plan sponsor is responsible for ensuring the Plan's proprietary and affiliate investment options would not be prohibited under ERISA.

15.     The defendants listed in ¶¶12-13 are referred to herein as the "Invesco Plan Sponsor Defendants."  At all relevant times herein, the Invesco Plan Sponsor Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) because they have discretionary authority to evaluate the Plan's proprietary investment options and determine whether they should be removed from the Plan, exercised or possessed discretionary authority or discretionary control with respect to management of the Plan, and/or exercised or possessed authority or control with respect to management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**The Invesco Benefits Committee Defendants**

16.     Defendant Invesco Benefits Plan Committee ("IBPC") is the Plan administrator and named fiduciary of the Plan.  The IBPC's responsibilities include *inter alia*: (i) control, management and administration of the Plan; (ii) establishment

of the Plan's investment policy; (iii) selecting and monitoring the Investment Options available to participants in the Plan; (iv) responsibility for the management, disposition, and investment of Plan assets; (v) the power to appoint and remove Plan investment managers; and (iv) ensuring that the Plan complies with ERISA, including the duties of loyalty and prudence codified in ERISA 404(c). As alleged below, IBPC selected wholly owned subsidiaries of Invesco to manage nearly all of the investment options offered by the Plan.

17.     During the Class Period, the IBPC consisted of the following individual defendants who were all senior executives of Invesco:

(a)     Defendant Washington Dender, Head of Invesco Human Resources and chairperson of the IBPC;

(b)     Defendant Ben Utt, Managing Director of Invesco U.S. Institutional Sales;

(c)     Defendant Gary Wendler, Head of Invesco's Product Development and Investment Risk;

(d)     Defendant Suzanne Christensen, Head of Invesco Enterprise Risk & Analytics;

(e)     Defendant Peter Gallagher, Head of Invesco Retail Sales;

(f)     Defendant John Coleman, Managing Director and Chief Administrative Officer; and

(g)     Defendant Douglas Sharp, who was removed as a member of the IBPC in October 2015.

18.     The defendants listed in ¶¶16-17 are referred to herein as the "Benefits Committee Defendants."  At all relevant times herein, the members of the IBPC (as well as the IBPC itself) were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) as a result of their membership on the IBPC and because they each exercised or possessed discretionary authority or discretionary control with respect to management of the Plan and/or exercised or possessed authority or control with respect to management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**The Board of Directors Defendants**

19.     Defendant Invesco Board of Directors Compensation Committee (the "Compensation Committee") is responsible for overseeing Invesco's defined benefit plans and programs and making recommendations to Defendant Invesco Board of Directors (the "Board") about proposed changes to benefit plans and delegating

- 8 -

fiduciary authority. The Board is responsible for appointing and removing the Plan administrator (*e.g.* the Benefits Committee) pursuant to the Plan Trust Agreement.[1]

20.    The Board consisted of the following individual defendants during the Class Period:

(a)    Defendant Robert Henrikson served on the Board, and as Chairperson of the Compensation Committee since 2014;

(b)    Defendant Sarah E. Beshar served on the Board and Compensation Committee since May 2017;

(c)    Defendant Joseph Canion served on the Board since May 2014;

(d)    Defendant Martin L. Flanagan served on the Board since August 2005;

(e)    Defendant Ben F. Johnson, III served on the Board and Compensation Committee since January 2009;

(f)    Defendant Denis Kessler served on the Board and Compensation Committee since March 2002;

---

[1]    The Plan's Trust Agreement states that the Sponsor's Board of Directors has the power to appoint and remove the Plan Administrator, which is the named fiduciary of the Plan. The Compensation Committee Charter gives the Compensation Committee authority over the Plan so the board referred to in the Plan's Trust Agreement is the Invesco Board of Directors.

(g)     Defendant Sir Nigel Sheinwald served on the Board and Compensation Committee since May 2015;

(h)     Defendant G. Richard Wagoner, Jr. served on the Board and Compensation Committee since October 2013; and

(i)     Defendant Phoebe A. Wood served on the Board and Compensation Committee since January 2010.

21.     The Defendants listed in ¶¶19-20 are referred to herein as the "Board of Directors Defendants."  The Board of Directors Defendants were and continue to be fiduciaries of the Plan under ERISA §3(21) (A), 29 U.S.C. §1002(21) (A), because they exercised or possessed discretionary authority or discretionary control with respect to management of the Plan, and/or exercised or possessed authority or control with respect to management or distribution of the Plan's assets, discretionary authority or discretionary responsibility in the administration of the Plan, and are responsible for appointing and removing members of the IBPC and ensuring the IBPC performs their  duties properly and in accordance with ERISA.

**The Investment Manager Defendants**

22.     Defendants Invesco Advisers, Invesco Trust Co., and PowerShares (collectively, the "Investment Manager Defendants") are wholly-owned subsidiaries of Invesco.  During the Class Period, the Investment Manager Defendants sponsored

and managed the Plan's investment options.   At all relevant times herein, the

Investment Manager Defendants received compensation in connection with

proprietary and/or affiliated mutual fund, collective trust, and ETF investments

offered in the Plan.  As an employer of employees covered by the Plan, the Investment

Manager Defendants were a party in interest to the Plan as defined by ERISA §3(14).

**The Plan**

23.   The Plan is a Nominal Defendant and at all relevant times herein has

been an "employee pension benefit plan" within the meaning of ERISA §3(2)(A),

29 U.S.C. §1002(2)(A), and a "defined contribution plan" or "individual account

plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan is named

as a nominal defendant pursuant to Fed. R. Civ. P. 19 to ensure that complete relief

can be granted as to claims brought on behalf of the Plan.

**The "Doe" Defendants**

24.   To the extent there are additional officers and employees of Invesco,

members of the Board, the IBPC, the Compensation Committee or other entities or

persons who were fiduciaries of the Plan during the Class Period, the identities of

whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their

identities are ascertained, to seek leave to join them to the instant action.  Thus,

without limitation, unknown "Doe" defendants include other individuals and entities

who were fiduciaries of the Plan within the meaning of ERISA §§3(21) and/or

402(a)(1) during the Class Period and are personally liable under ERISA §409(a).

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

**The Duties of Loyalty and Prudence**

25.    ERISA imposes strict fiduciary duties of loyalty and prudence upon plan

fiduciaries.  ERISA §404(a)(1)(a) sets forth the duty of loyalty, which states that,

fiduciaries must discharge their duties solely in the interest of plan participants and

beneficiaries and for the exclusive purpose of providing benefits to participants and

their beneficiaries and defray reasonable expenses of administering the plan.

26.    The duty of loyalty requires fiduciaries to act with an "'eye single'" to

the interests of plan participants.[2]  As the Supreme Court has noted, "Perhaps the most

fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty

to the interests of the beneficiary and must exclude all selfish interest and all

consideration of the interests of third persons.'"  *Id*. at 224.

27.    Where fiduciaries have conflicting interests that raise questions regarding

their loyalty, the fiduciaries "are obliged at a minimum to engage in an intensive and

_____

[2]      *Pegram v. Herdrich,* 530 U.S. 211, 235 (2000).

scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries."[3]

28.    ERISA §404(a)(1)(b) also imposes a "prudent person" standard upon fiduciaries.[4] This duty of prudence means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use."[5]  The duty of prudence means that fiduciaries must not only select prudent investments, but that, they must monitor the investments to ensure they do not become imprudent over time.[6]

29.    In measuring the prudence of fiduciaries' conduct, courts state that the key element is the process for considering and examining relevant information.  As one court explained, "ERISA §404(a)(1)(B) requires only that the [fiduciaries] vigorously and independently investigate the wisdom of a contemplated investment; it matters not that the investment succeeds or fails, as long as the investigation is

---

[3]    *Kanawi v. Bechtel*, No. 09-16253 (9th Cir. 2009) (DOL Amicus Brief).

[4]    This standard measures fiduciaries' investment decisions and disposition of assets.  *See Fifth Third Bancorp v. Dudenhoeffer,* 134 S. Ct. 2459, 2467 (2014) (citation omitted).

[5]    ERISA §404(a)(1)(b).

[6]    *See Tibble v. Edison,* 135 S. Ct. 1823, 1828 (2015).

'intensive and scrupulous and . . . discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan.'" [7]

30.    Thus, to meet the prudent process requirement, fiduciaries must vigorously and thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  This means considering competing funds to determine which fund should be included in the plan's investment line-up.   "A fiduciary must engage in an objective, thorough, and analytical process that involves consideration of the quality of competing providers and investment products, as appropriate." [8]

31.    In satisfying these duties, fiduciaries should consider a variety of funds and the expenses associated with the possible funds.[9]  Furthermore, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence

---

[7]     *Donovan v. Walton*, 609 F. Supp. 1221, 1238 (S.D. Fla. 1985).

[8]     72 Fed. Reg. 60453 (October 24, 2007) (Preamble).

[9]     *See Tibble v. Edison Int'l*, No. Cv-07-5359-SVW, 2010 U.S. Dist. LEXIS 69119 (C.D. Cal. July 8, 2010) (noting that fiduciaries must engage in a thorough investigation of the merits of an investment and noting that the fiduciaries considered five investment criteria, including the expense ratio, when selecting funds).

in selecting investments." [10] If an investment is imprudent, the plan fiduciary "'must dispose of it within a reasonable time.'"

### Fiduciaries Are Required Under ERISA to Act in the Best interest of Plan Participants When Selecting and Maintaining Investment Options

32.     ERISA was enacted to protect the interests of plan participants and their beneficiaries and requires Plan fiduciaries to act "solely in the interest of the participants and beneficiaries" and to have an "eye single" to their best interest.  To meet their fiduciary obligations, ERISA requires plan fiduciaries to establish and maintain a prudent process to search the market for the best investment options. Moreover, ERISA requires fiduciaries to regularly monitor and review existing investment options to determine whether it is prudent to keep or remove those options from the Plan.  Where fiduciaries have conflicting interests that raise questions about their loyalty to the Plan, they "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to ensure that they act in the best interests of the plan beneficiaries." [11]

---

[10]     *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

[11]     *Kanawi v. Bechtel*, No. 09-16253 (9th Cir. 2009) (DOL Amicus Brief).

**Co-Fiduciary Liability**

33.     ERISA §405(a) imposes explicit co-fiduciary liability on plan fiduciaries. provides for fiduciary liability for a co-fiduciary's breach: "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

34.     ERISA 409 (a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan

by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

35.    In addition to the duties of loyalty and prudence imposed by ERISA §404, certain transactions are expressly prohibited by ERISA §406, and are considered *per se* violations of ERISA because they entail a high potential for abuse.

36.    Each of the Defendants are subject to co-fiduciary liability under 29 U.S.C. §1105(a)(1)(3) because they enabled other fiduciaries to commit breaches of fiduciary duty through their appointment powers, failed to comply with 29 U.S.C. §1104(a)(1) in the administration of their duties, or failed to remedy the known breaches of duty carried out by other fiduciaries.

## SUBSTANTIVE ALLEGATIONS

**The Plan**

37.    The Plan, established and effective as of January 1, 2000, is a defined-contribution Plan for the controlled group of Invesco subsidiaries: (i) IVZ (the Plan sponsor), (ii) Invesco Management Group Inc., (iii) Invesco Group Services, Inc., and (iv) Invesco North American Holding, Inc. (collectively the "Plan Employers"). Defendant Invesco is the ultimate parent company of the Plan Employers.  IBPC is the administrator of the Plan.  The Plan's assets were bolstered in April 2011 when the

Invesco ESOP was merged into the Plan.  As of December 31, 2016, the Plan had over $890 million in assets, making it one of the largest 401(k) plans in the country.

38.     The written instrument, within the meaning of ERISA §402, 29 U.S.C. §1102, by which the Plan is maintained is the Invesco 401(k) Plan (the "Plan Document"), as amended as of January 1, 2015.  Under the Trust Agreement, Charles Schwab Trust Company ("Schwab") is the directed trustee and custodian of the Plan, receiving both direct and indirect compensation from the Plan.

39.     The Plan provides retirement income for employees of the Plan Employers.  The amount of retirement income provided by the Plan is derived from the investment returns generated on contributions by or on behalf of Plan participants, less fees and expenses.  Eligible employees of the Plan Employers may participate in the Plan by investing up to 75% of their eligible earnings in investments offered by the Plan  (the "Investment Options").

40.     Investment returns, fees and expenses are dependent upon the Investment Options offered in the Plan and the Plan fiduciaries have exclusive control over the menu of Investment Options offered to Plan participants.

**The Plan Offered Too Many Investment Options and Nearly All Investment Options Were Affiliated with Invesco**

41.     Defendants did not employ a careful and thoughtful process to select and offer prudent investment options to serve the best interests of Plan participants.

Rather, Defendants loaded the Plan with mostly Investment Options managed by or affiliated with Invesco.  To make matters worse, Defendants failed to even carefully select which ***Invesco*** Investment Options to include in the Plan and instead indiscriminately filled the Plan with a huge number of Invesco affiliated investment products.

42.     According to the Plan's "Summary Plan Description" (the "SPD"), the purpose of the Plan is to "encourage eligible employees to regularly save a part of their earnings and to help them accumulate an additional source of financial security primarily for retirement."  The SPD stresses that participants "will obtain the greatest value from the Plan if [they] understand the benefits available and the choices [they] can make under the Plan."

43.     Rather than evaluating and selecting the Plan's Investment Options through a careful and prudent process serving the best interests of Plan participants, Defendants indiscriminately placed mostly Invesco-affiliated investment products in the Plan and failed to limit the huge number of offerings to a manageable amount.

44.     During the Class Period, the Plan offered between approximately 155 to 205 different Investment Options.  This was more than 10 times the average number of Investment Options in defined contributed plans.  Offering such a large number of Investment Options in the Plan was imprudent since it vastly exceeded the number of

options that were manageable by Plan participants.  Even though the SPD recognizes

the importance of Plan participants understanding the Investment Options offered by

the Plan, the sheer number of Investment Options rendered it virtually impossible for

the typical participant to adequately understand anywhere from 153 to 207 Investment

Options.

45.     Furthermore, even though the Plan offered so many Investment Options,

Plan participants were limited to selecting between mostly Invesco-affiliated

investment products.  For example, during 2015 and 2016, approximately 95% of the

Plan's roughly 200 Investment Options were affiliated with Invesco.

46.     The below chart lists the number of the Plan's Investment Options and

the percentage of options affiliated with Invesco:

| Plan Year | Investment Options | Percentage Proprietary or Affiliated |
|-----------|--------------------|--------------------------------------|
| 2012 | 153 | 93% |
| 2013 | 158 | 93% |
| 2014 | 173 | 94% |
| 2015 | 207 | 95% |
| 2016 | 206 | 95% |

47.     As reflected in the above chart, throughout the Class Period, rather than

carefully evaluating Investment Options and eliminating poorly performing funds,

Defendants substantially increased the number of offerings from 153 in 2012 to 206 in

2016, to the detriment of Plan participants.   In 2015 alone, the Plan added

approximately 34 Investment Options, a majority of which were proprietary and/or affiliated with Invesco.

48.     The Plan's large number of proprietary Investment Options contrasts with the typical 401(k) plan which offers a fraction of the investment options offered by the Plan and has decreased investment options over time in recognition of the risk, expense, and bad practice of offering too many investment options to participants.

49.     For example, a December 2014 study by The Investment Company Institute found that 401(k) plans offered on average 25 investment options. Likewise, the Callan Investment Institute's 2015 Defined Contribution Trends Survey determined defined contribution plans offered an average of 15 investment options. According to the Callan Investment Institute Survey in 2017, a majority of plan sponsors reported decreasing (rather than increasing) the number of investment options offered in their plans.

50.     Here, the inclusion, retention, and addition of these Investment Options was the result of an imprudent process, as reflected by the poor performance and high fees associated with many of the Investment Options. Defendants' failure to employ a prudent process is shown by the inclusion and addition of multiple share classes of the same mutual funds and/or the inclusion and/or addition of higher cost retail shares even though lower cost alternatives were available. Defendants effectively treated

Plan participants as a captive market and testing ground for the Company's investment products and sought to use Plan assets to generate fees and boost assets under management for Invesco's investment management business.

51.     By offering mostly affiliated investment options and at times multiple share classes of the same fund, Defendants violated the terms of the Plan Document which states that "each investment option will be ***diverse from the other investment options*** having materially different risk and return characteristics."   Duplicative investments in the major asset classes and investment styles rendered the selection of Investment Options by Participants difficult and added greater risk to their portfolios.

52.     Even though the Trust Agreement states that "Plan participants… have the responsibility for the decision to invest in (or remain invested in) [Invesco] securities," Defendants severely limited this choice because Plan participants were mostly limited to Invesco and/or affiliated securities.

53.     During the Class Period, the Invesco-affiliated funds in the Plan consistently suffered from poor performance and significantly greater risk than comparable readily apparent investment options.  A prudent and loyal fiduciary under these circumstances would not have selected, retained, or added these poorly-performing investments.

54.    As reflected in the below examples from industry professionals and/or academics, the dangers of offering too many investment options should have been known by the Plan fiduciaries during the Class Period:

- Michael Liersch, now Head of Goals-Based Advice and Strategy at JP Morgan Chase & Co., wrote in 2009 that too many choices may create confusion, resulting in poorly informed consumer decisions and "***decision paralysis***."

- A 2013 study by Sheena Iyengar, professor of business at Columbia University, assessing the risk of "paralyzing" employees with "choice overload" in defined contribution plans.  According to Professor Iyengar, offering too many investment options  has the tendency to reduce employee participation in 401(k) plans, and dilute equities from their portfolios making them inherently ***more risky***.

- A 2014 *CNBC* article based on the above 2013 Iyengar study entitled *"How many 401(k) Options Are Too Many"*  reported that even 25 may be considered to be too many because of the risk of "***paralyzing***" employees with too many investment choices and lack of diversification.

- In January 2016, a study by professors at the University of Pennsylvania, Wharton School of Economics, published by the National Bureau of Economic Research, found that "too many choices may create confusion, resulting in ***poorly informed consumer decisions***."

- Peter Lazaroff, Co-Chief Investment Officer, at Plancorp, Financial Services stated in a February 2017 *Forbes* article that one of the hallmarks of an imprudent 401(k) plan is too many investment options. Lazaroff states "there are very few plan participants that are savvy enough to properly diversify when given too much choice. Too much choice can even lead investors to feel so overwhelmed that they do something worse than make poor decisions: they choose nothing at all. ***A good plan doesn't need more than 15 funds***."

- 23 -

- Robert Lawton, the President of the firm, Lawton Retirement Plan Consultants, LLC, wrote in February 2018: "As president of a registered investment advisory firm that works exclusively with retirement plans, I get the opportunity to take a look at a lot of employers' 401(k) plan investment menus. I *am astounded that there still are 401(k) plans that offer 50, 75, even up to 100 investment options.*"

55.     The Plan fiduciaries ignored the risks in offering too many investment options and loaded the Plan with Invesco products in violation of their fiduciary duties.

### Defendants Failed to Use Their Leverage as One of the Larger Defined Benefit Plans in the United States to Reduce Costs for the Benefit of Plan Participants

56.     For the Plan year ended December 31, 2016, the Plan reported more than $890 million in assets, making it one of the largest – and thus one of the most powerful in terms of bargaining position – defined-contribution plans in the United States.  As a result of its large size, the Plan could have used its significant bargaining power, economies of scale and leverage to achieve fees far less than those available to individual investors who have no other option but to invest in retail shares.

57.     Defendants failed to take advantage of its bargaining power for the benefit of Plan participants.  A common strategy to reduce fees is to structure investment options as collective trusts or pooled separate accounts.  Collective trusts, which are not available to retail investors and are regulated by the Office of the Comptroller of the Currency rather than the SEC, have simpler disclosure statements,

smaller prospectuses and lower advertising and marketing costs.  Similarly, separate accounts, which are available to retirement plans, have lower regulatory oversight and reporting and disclosure requirements.  As a result, these investment structures can often charge significantly lower fees than comparable mutual fund investment strategies.  For example, according to a January 2016 report by State Street, the expense ratios of collective trusts were up to 30% lower than comparable mutual funds.

58.     Even though the Plan had the bargaining power to offer collective trust investments instead of mutual funds, Defendants filled the Plan with a large number of mutual funds, most of which were affiliated with Invesco.  For example, in 2016, Defendants offered more than 65 proprietary mutual funds many of which were retail mutual fund classes with higher management fees than available institutional share classes of the same funds, to the detriment of Plan participants.  In almost all circumstances, the Invesco retail share classes had substantially lower returns than the institutional share classes with higher fees.

59.     It was imprudent to offer expensive retail classes of mutual funds when institutional shares of those same funds were offered to other investors and when most of the funds were affiliated with Invesco. Invesco both retained existing, and added new, retail share classes throughout the Class Period.

- 25 -

60.     Furthermore, the Plan offered both retail and institutional share classes for a number of mutual funds.  For example, in 2015, Invesco added both institutional and retail share classes of its American Value Fund to the Plan's Investment Options even though the prior year the retail shares performed 4.27% below its benchmark and the institutional shares performed 3.97% below its benchmark.  The high fees associated with this proprietary investment option, along with other proprietary funds added to the Plan, unjustly enriched Defendants' to the detriment of Plan participants.

61.     Defendants caused the Plan to offer mostly affiliated investment options in order increase Invesco's assets under management and to earn lucrative fees to the detriment of Plan participants.  The Plan's "Fee and Investment Change Notice" issued to Plan participants reflects that operating expenses as being charged to the proprietary Investment Options and the amounts are based on a percentage of assets managed by the Investment Option.  And the Plan's Summary Plan Description ("SPD") clarifies that fees are "charged" to the Investment Options themselves and that participant returns are *net* of such fees.  As such, the participants paid fees for the Investment Options and because these fees expenses increased when assets increased, Defendants were incentivized to bolster the assets under management for Invesco's proprietary Investment Options in order to increase the fees paid to the Investment Manager Defendants—all Invesco subsidiaries.

62.    Additionally, the Plan imposed administrative expenses on Plan participants, as set by the IBPC, to "effect the investment election made my each participant."  During the Class Period, the total administrative expenses paid by the Plan ranged from a low of $160,544 in 2015 to $338,973 in 2013 and from 2012-2016 amounted to approximately $1.2 million.  These administrative fees were unnecessary and would have been considerably lower had the Plan not offered as many investment options.

### The Plan fiduciaries Breached their Fiduciary Duties by Offering Imprudent Affiliated ETF Investment Products to Plan Participants.

63.    In addition to proprietary mutual funds, Defendants loaded the Plan with Invesco-affiliated ETFs.  And Defendants failed to engage in a prudent process to identify and select ETFs appropriate for the Plan.  Instead, in breach of their fiduciary duties, Defendants simply dumped a large percentage of affiliated ETFs into the Plan.  For example, during 2016, the Plan offered nearly 100 Invesco ETFs, sponsored by Defendant PowerShares.  This amounted to approximately 65% of Invesco's entire ETF portfolio as of September 30, 2017.  Put another way, only 35% of Invesco's total ETF business was not offered to Plan participants.

64.    Defendants treated Plan participants as captive investors to boost the assets under management for Invesco ETFs and to increase the volume of ETF shares

traded, an important metric used by ETF investors. Invesco's ETF business directly benefited from the inclusion of the ETFs in the Plan.[12]

65.     Additionally, instead of attempting to identify and select the most prudent ETFs based on investment category, the Plan simply included many ETFs within the same investment subcategories, including the: (i) "dividend achievers" ETFs; (ii) "preferred income" ETFs; (iii) "buy backs" ETFs (iv) "thematic commodity equities" ETFs; (v) "thematic sustainable" ETFs; and (vi) "bulk beta financial sectors" ETFs. The inclusion of ETFs in these types of subcategories, as well as the inclusion of several ETFs per investment category, was imprudent and made the selection of Investment Options overly complicated.  Furthermore, during the Class Period, many of the ETFs performed poorly in both absolute terms and relative to their peers.

66.     For illustration purposes, below is a sampling of ETFs in several Invesco investment categories offered to Plan participants during the Class Period that suffered from poor performance:

---

[12]     Invesco has focused heavily on its ETF business. Even though it recently purchased Guggenheim's ETF business for $39 billion in or around April 2018, it still trails the top three ETF companies, Vanguard, State Street and BlackRock by a large margin as measured by assets under management

| Investment Option | Investment Category | 1 Year Trailing Return[13] | 3 Year Trailing Return | 5 Year Trailing Return |
|---|---|---|---|---|
| FTSE RAFI Asia Pacific ex-Japan portfolio (PAF) | "Pacific/Asia ex-Japan stock" | 13.27 % Category Rank: **Bottom 82%** | 6.95% Category Rank: Top 36% | 4.21% Category Rank: **Bottom 83%** |
| *+/- Benchmark* | | *-4.32%* | *0.71%* | *-2.29%* |
| DB G 10 Currency Harvest Fund  (DBV) | "Multicurrency" | 0.02 Category Rank: Top 40% | -0.49% Category Rank: **Bottom 68%** | -2.33% Category Rank: **Bottom 85%** |
| *+/- Benchmark* | | *-1.49* | *-.88%* | *-1.83%* |
| Dynamic Biotechnology & Genome Portfolio (PBE) | "Health" | 18.54 Category Rank: Top 40% | -3.09% Category Rank: **Bottom 88%** | 12.09% Category Rank: **Bottom 65%** |
| *+/- Benchmark* | | *-0.23%* | *-7.12%* | *-1.74%* |
| Global Agriculture Portfolio (PAGG) | "Natural Resources | 14.39% Category Rank: **Bottom 88%** | -1.59% Category Rank: **Bottom 88%** | -0.52% Category Rank: **Bottom 71%** |
| *+/- Benchmark* | | *-15.05%* | *-2.27%* | *-0.49%* |
| S&P Small Cap Information Technology Portfolio (PSCT) | "Technology" | 13.00% Category Rank: **Bottom 96%** | 15.39% Category Rank: **Bottom 77%** | 18.23% Category Rank: **Bottom 68%** |
| *+/- Benchmark* | | *-15.05%* | *-2.27%* | *-0.54%* |
| International Dividend Achievers Portfolio (PID) | "Foreign Large Value" | 9.58% Category Rank: **Bottom 66%** | -1.36% Category Rank: **Bottom 95%** | 1.60% Category Rank: **Bottom 93%** |
| *+/- Benchmark* | | *-1.12* | *-4.72%* | *-3.08%* |
| VRDO Tax Free Weekly Portfolio (PVI) | "Muni National Short" | 0.80% Category Rank: Top 15% | 0.36% Category Rank **Bottom 90%** | 0.18% Category Rank: **Bottom 90%** |
| *+/- Benchmark* | | *-0.14%* | *-0.43%* | *-1.16* |
| S&P Emerging Markets Low Volatility Portfolio (EELV) | "Diversified Emerging Markets" | 12.47% Category Rank: **Bottom 73%** | 1.17% Category Rank: **Bottom 92%** | -0.28% Category Rank: **Bottom 91%** |
| *+/- Benchmark* | | *-1.11* | *-3.50* | *-2.72* |

67.    Had the Plan's fiduciaries performed a careful and prudent analysis of

Investment Options, they would not have included or would have removed or replaced

many of the Plan's poor performing ETF Investment Options.

---

[13]    Trailing returns for the one year, three year and five-year periods of the ETF investments in the above table were retrieved from Morningstar and are as of May 18, 2018.

68.     For example, had a prudent fiduciary believed it necessary to offer ETF investment options in the Japanese and/or Asian equity markets, the iShares Asia 50 ETF (AIA) was a far better option, with trailing returns as of May 18, 2018 of 23.32%, 10.74%, and 9.84% in the one year, three year, and five-year intervals compared to 13.27%, 6.95%, and 4.21% for Invesco's FTSE RAFI Asia Pacific ex-Japan portfolio (PAF) over the same time period.  Likewise, had a prudent fiduciary believed it necessary to offer a diversified emerging markets ETF like Invesco's S&P Emerging Markets Low Volatility Portfolio (EELV), Schwab's Emerging Markets ETF (SCHE) was a far more prudent investment.  As of May 18, 2018, SCHE's trailing returns were 15.90%, 4.11%, and 3.59%, for the one year, three year, and five year periods, respectively, when EELV's returns were 12.47%, 1.17%, and -0.28% for the same periods.

69.     Furthermore, had Defendants sought to fulfill their fiduciary obligations, they would have combined overlapping ETF Investment Options to reduce potential confusion by Plan participants and lower risk through diversification.  For example, the Plan offered six separate Commodities ETFs: (i) DB Agriculture Fund (DBA); (ii) DB Base Materials Fund (DBB); (iii) DB Energy Fund (DBE); DB Gold Fund (DGL); DB Oil Fund (DBO) and DB Silver Fund (DBS).  These ETFs could have been replaced by a single diversified ETF that invested in each of the preceding categories.

In fact, Invesco's own commodity ETF named "Optimum Yield Diversified Commodity Strategy" (ticker "PDBC") is diversified and has exposure to each of the six commodity categories above. Yet, it was not offered to Plan participants during the Class Period even though, as of May 18, 2018 it had strong one-year trailing returns in the top 18% and three-year trailing returns in the top 18% of its category and its net expense ratio, 0.59%, was lower than all of the other six commodities ETF included in the Plan.

### The Plan Offered Worse Performing Retail Shares Instead of Better Performing Institutional Shares

70.    Defendants, as they did with their ETFs, overwhelmed Plan participants with scores of proprietary mutual fund offerings that performed poorly, were expensive, and were not selected as the result of a prudent process that put the interests of Plan participants first.  Rather, these mutual funds benefitted Invesco to the detriment of Plan participants.

71.    During the Class Period, the Plan offered several dozen Invesco proprietary or affiliated mutual funds along with only a handful of non-affiliated options amounting to $140 million to $260 million of Plan assets.

72.    For many mutual fund options Defendants offered both retail and institutional shares, even though the retail shares offered were more expensive and

had worse performance than the institutional shares.  For example, retail shares are usually classified as "Class A" shares. According to the *Wall Street Journal,* Class A retail shares typically have an "upfront sales charge" that often ranges from 5.5% to 5.75%.  And, even if the "upfront charge" is waived, Class A shares are almost always still more expensive than their institutional counterparts.  The only reason Class A shares are even offered at all is for retail investors who do not have the capital to meet the minimum requirements of purchasing cheaper, institutional shares.

73.     Here, Defendants offered Plan participants Class A shares, even though there was no prudent basis to do so, since the Plan already offered institutional shares of the same investments.  The performance and administrative expenses associated with the Class A shares was poor compared to the institutional funds.  As an illustration, set forth below is a sampling of the Invesco mutual funds offered to Plan participants with Class A shares and Class Y, institutional shares.  Representative examples of the imprudence in offering retail shares of the same mutual fund when the fund's institutional shares performed better and were less expensive are listed below:

| Fund | Expense Ratio | 2012 Return | 2013 Return | 2014 Return | 2015 Return | 2016 Return | 2017 Return |
|---|---|---|---|---|---|---|---|
| Developing Markets Fund, Institutional Shares (GTDYX) Institutional Class | 1.18% | 19.85% | -2.96 | -3.02% | -18.50% | 20.05% | 30.65% |
| *+/- Benchmark* | | *3.02* | *-18.24* | *0.84* | *-12.84* | *15.56* | *3.45* |
| Invesco Developing Markets Fund Retail Shares (GTDDX) | 1.43% | 19.52 | -3.22 | -3.26 | -18.69 | 19.75 | 30.34 |
| *+/- Benchmark* | | *2.69* | *-18.50* | *0.61* | *-13.03* | *15.26* | *3.15* |
| Balanced Risk Allocation Fund, Institutional Shares (ABRYX), | 1.06% | 10.83 | 2.29 | 5.83 | -4.51 | 11.35 | 9.95 |
| *+/- Benchmark* | | *-1.21* | *-12.02* | *0.94* | *-2.72* | *2.78* | *-4.71* |
| Balanced Risk Allocation Fund Retail Shares (ABRZX)s | 1.31% | 10.57 | 2.07 | 5.50 | -4.68 | 10.97 | 9.78 |
| *+/- Benchmark* | | *-1.48* | *-12.24* | *0.61* | *-2.89* | *2.40* | *-4.88* |
| Comstock Fund, Institutional Shares (ACSDX) | 0.59% | 19.19 | 35.58 | 9.39 | -5.70 | 18.08 | 18.11 |
| *+/- Benchmark* | | *3.19* | *3.19* | *-4.30* | *-7.08* | *6.12* | *-3.72* |
| Comstock Fund Retail Shares (ACSTX) | 0.84% | 18.90 | 35.24 | 9.12 | -5.93 | 17.83 | 17.77 |
| *+/- Benchmark* | | *2.90* | *2.85* | *-4.57* | *-7.32* | *5.87* | *-4.06* |
| Global Real Estate Fund  Institutional Shares  (ARGYX) | 1.11% | 28.04 | 2.64 | 14.41 | -1.36 | 1.82 | 13.02 |
| *+/- Benchmark* | | *11.91* | *-20.16* | *10.25* | *1.00* | *-6.04* | *-10.95* |
| Global Real Estate Fund Retail  Shares (AGREX) | 1.36% | 27.25 | 2.38 | 14.15 | -1.61 | 1.57 | 12.66 |
| *+/- Benchmark* | | *11.62* | *-20.43* | *9.98* | *0.75* | *-6.29* | *-11.31* |
| Equally Weighted S&P 500 Institutional Shares (ARGYX) | 1.11% | 28.04 | 2.64 | 14.41 | -1.36 | 1.82 | 13.02 |
| *+/- Benchmark* | | *11.91* | *-20.16* | *10.25* | *1.00* | *-6.04* | *-10.95* |
| Equally Weighted S&P 500 Retail Shares (VADAX) | | 16.97 | 35.33 | 13.76 | -2.73 | 14.11 | 18.27 |
| *+/- Benchmark* | | *0.97* | *2.94* | *0.07* | *-4.11* | *2.15* | *-3.56* |

74.     As shown above, in virtually every instance where retail Class A, retail shares, are offered of an Invesco mutual fund with institutional shares already offered, the expenses are higher, and the returns are markedly lower.

75.     Even though these proprietary investment options are imprudent regardless of whether institutional share classes are chosen, because in most instances they performed well below their benchmark during the Class Period, the offering of retail shares only deepened their imprudence.  Considering Invesco is one of the larger defined contribution Plans in the United States, it had the bargaining power to negotiate lower fees on mutual funds, let alone its own proprietary mutual funds.

76.     There is no and has been no legitimate reason to offer Plan participants proprietary retail shares other than to promote the mutual fund business of Invesco and increase the assets under management for its retail share offerings.   Plan participants who were invested in retail shares have been needlessly damaged with higher fees and poorer performance compared to the institutional share offerings, all because of the self-interest of Defendants.

**The Plan Fiduciaries Added Poorly Performing Proprietary Mutual Funds to the Plan**

77.     During the Class Period, Defendants did not remove poor performing proprietary investment options from the Plan to make the investment options less confusing, risky, and more prudent.  Instead, they ***added*** proprietary and/or affiliated

- 34 -

mutual funds with poor track records.  This included adding nearly 35 Investment Options to the Plan in 2015.   In general, Defendants added poor performing proprietary mutual fund options despite the existence of better performing non-proprietary funds.

78.    For example, in 2013, Defendants added both institutional and retail share classes of the Invesco American Franchise Fund (VAFFX) to the Plan's Investment Options.  In the years preceding the Class Period and during the Class Period its performance was poor compared to its benchmark and investment category averages.  For example, in the years preceding the American Franchise Fund's addition to the Plan, 2011 and 2012, it underperformed its benchmark the S&P 500, by 8.84% and 2.55%.[14]

79.    If Defendants had faithfully executed their fiduciary duties to the Plan and its participants they would have selected one of the better performing non-proprietary funds available with comparable strategies, set forth below.

80.    As the chart below shows, the American Franchise Fund's cumulative return from 2011 through 2017 was only 122.76% compared to available alternative

---

[14]    Giving Defendants the benefit of the doubt, Plaintiff analyzed the institutional share returns of the American Franchise Fund.  The American Franchise Fund's retail shares, which were also added to the Plan in 2013 underperformed their benchmark by an even greater margin in 2011 and 2012: 8.96% and 2.81%.

investments such as EGFIX, FDGRX, TRLGX, POGRX, and VGIAX which returned,

198.79%, 193.74%, 184.00%, 175.41%, and 151.34% respectively during that period.

Specifically, each one of these alternative funds had better returns in 2011 and 2012

by a wide margin.

**INVESCO ERISA**
**Invesco American Franchise Fund Class R6 (VAFFX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| VAFFX | -6.73% | 13.45% | 40.40% | 8.74% | 5.42% | 2.51% | 27.60% | **122.76%** | **12.12%** |
| Edgewood Growth Class Institutional Fund (EGFIX) | 3.73% | 18.72% | 37.19% | 13.50% | 11.59% | 3.57% | 34.82% | **198.79%** | 16.93% |
| +/-VAFFX | 10.46% | 5.27% | -3.21% | 4.76% | 6.17% | 1.06% | 7.22% | 76.02% | 4.80% |
| Fidelity Growth Company (FDGRX) | 0.67% | 18.52% | 37.61% | 14.44% | 7.83% | 6.01% | 36.76% | **193.74%** | 16.64% |
| +/-VAFFX | 7.40% | 5.07% | -2.79% | 5.70% | 2.41% | 3.50% | 9.16% | 70.98% | 4.52% |
| T. Rowe Price Institutional Large Cap Growth Fund (TRLGX) | -1.40% | 17.55% | 44.44% | 8.72% | 10.08% | 2.85% | 37.82% | **184.00%** | 16.08% |
| +/-VAFFX | 5.33% | 4.10% | 4.04% | -0.02% | 4.66% | 0.34% | 10.22% | 61.24% | 3.96% |
| PRIMECAP Odyssey Growth Fund (POGRX) | -2.22% | 16.76% | 39.30% | 13.92% | 6.18% | 8.42% | 32.05% | **175.41%** | 15.57% |
| +/-VAFFX | 4.51% | 3.31% | -1.10% | 5.18% | 0.76% | 5.91% | 4.45% | 52.65% | 3.45% |
| Vanguard Growth and Income Fund Admiral Shares (VGIAX) | 2.54% | 17.05% | 32.74% | 14.16% | 2.03% | 12.12% | 20.80% | **151.34%** | 14.07% |
| +/-VAFFX | 9.27% | 3.60% | -7.66% | 5.42% | -3.39% | 9.61% | -6.80% | 28.58% | 1.95% |

81.    Even the "worst" performing comparable fund in this group, VGIAX

achieved cumulative returns that were 28.58 more than the American Franchise Fund

representing approximately a 23% increase in returns when compared to the American

Franchise Fund. Similarly, the compound annual growth rate ("CAGR") of the

American Franchise Fund amounted to only 12.12% during the 2011 to 2017 period.

By comparison, the EGFIX, FDGRX, TRLGX, POGRX, and VGIAX funds achieved

superior CAGRs of 16.93%, 16.64%, 16.08%, 15.57% and 14.07% respectively, during that period.

82.     Defendants used Plan participants as a captive investor base to prop up the business of Invesco Advisers.  A fiduciary acting in the best interest of the Plan's participants and with due care would have never inserted the American Franchise Fund into the Investment Options of the Plan because of its poor performance. The only reason the American Franchise Fund was added to the Plan's Investment Fund was because of its affiliation with Invesco.

83.     Then, in 2014, Defendants added institutional shares of the Invesco Developing Markets Fund, Institutional Shares (GTDFX) to the Plan's Investment Options.  This was an imprudent decision considering that the Invesco Developing Markets Fund (GTDFX) before, and during the Class Period underperformed comparable non-proprietary funds in the same investment category and with the same investment style.

84.     Indeed, had Defendants faithfully executed their fiduciary duties to the Plan and its participants they would have selected one of the better performing non-proprietary funds available with comparable strategies, set forth below.

**INVESCO ERISA**
**Invesco Developing Markets Fund Class R6 (GTDFX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| **GTDFX** | **-11.34%** | **19.66%** | **-2.81%** | **-2.82%** | **-18.34%** | **20.22%** | **30.86%** | **28.73%** | **3.67%** |
| | $0.89 | $1.06 | $1.03 | $1.00 | $0.82 | $0.98 | $1.29 | 28.73% | 3.67% |
| GuideMark Emerging Markets Fund Institutional Shares (GILVX) | -2.05% | 14.60% | 37.11% | 7.81% | -10.10% | 9.55% | 38.46% | **126.26%** | 12.37% |
| +/-GTDFX | 9.29% | -5.06% | 39.92% | 10.63% | 8.24% | -10.67% | 7.60% | 97.54% | 8.70% |
| Baron Emerging Markets Fund Institutional Shares (BEXIX) | -17.00% | 23.22% | 15.02% | 3.75% | -10.97% | 4.08% | 40.63% | **59.04%** | 6.85% |
| +/-GTDFX | -5.66% | 3.56% | 17.83% | 6.57% | 7.37% | -16.14% | 9.77% | 30.31% | 3.18% |
| American Century Emerging Markets Fund R6 Class (AEDMX) | -21.60% | 24.86% | 0.42% | -1.21% | -7.87% | 7.90% | 46.36% | **41.29%** | 5.06% |
| +/-GTDFX | -10.26% | 5.20% | 3.23% | 1.61% | 10.47% | -12.32% | 15.50% | 12.57% | 1.39% |
| Goldman Sachs Emerging Markets Equity Fund Institutional Class (GEMIX) | -20.11% | 17.77% | -3.14% | 1.26% | -5.61% | 5.31% | 48.31% | **36.04%** | 4.50% |
| +/-GTDFX | -8.77% | -1.89% | -0.33% | 4.08% | 12.73% | -14.91% | 17.45% | 7.32% | 0.82% |
| Baillie Gifford The Emerging Markets Fund Class 1 (BGEGX) | -20.32% | 13.73% | 3.82% | 0.08% | -7.51% | 0.70% | 52.97% | **34.15%** | 4.29% |
| +/-GTDFX | -8.98% | -5.93% | 6.63% | 2.90% | 10.83% | -19.52% | 22.11% | 5.42% | 0.61% |

85.     As the chart above shows, the Developing Markets' Fund cumulative return from 2011 through 2017 was only 28.73% compared to available alternative investments such as GILVX, BEXIX, AEDMX, GEMIX, and BGEGX which returned, 126.26%, 59.04%, 41.29%, 36.04% and 34.15% respectively during that period.

86.     Even the "worst" performing comparable fund in this group, BGEGX achieved cumulative returns that were 5.42 more than the Developing Markets' Fund representing approximately a 19% increase in returns when compared to the Developing Markets' Fund.  Similarly, the CAGR of the Developed Markets Fund

- 38 -

amounted to only 3.67% during the 2011 to 2017 period.  By comparison, the alternative funds achieved superior CAGRs of 12.37%, 6.85%, 5.06%, 4.50%, and 4.29% respectively, during that period.

87.     Defendants used Plan participants as a captive investor base to prop up the business of Invesco Advisers.  A fiduciary acting in the best interest of the Plan's participants and with due care would have never inserted the Invesco Developing Markets Fund into the Investment Options of the Plan because of its poor performance.  The only reason the Developing Markets Fund was added to the Plan's Investment Fund was because of its affiliation with Invesco.

### The Plan Fiduciaries Breached their Fiduciary Duties by Offering Imprudent Invesco Target Date Funds with High Expenses and Poor Performance

88.     Target date funds are investment products that are designed to help people save for retirement and the year associated with a specific fund typically relates to an expected year for retirement.  A target date fund is marketed as a one stop shop for investors since they provide a balanced portfolio that is reallocated over time as an investor gets closer to retirement.

89.     Invesco launched a series of target date mutual funds in 2007 but failed to offer them Plan participants at that time.  Years later, in 2015, Invesco finally offered retail shares of a single target date fund, the Invesco Balanced Risk Retirement Fund

2050 Fund ("2050 Fund"), to the Plan Investment Options and then in 2016, offered the Invesco Balanced Risk Retirement 2020 Fund ("2020 Fund").

90.     The Plan fiduciaries first breached their fiduciary duties by failing to offer any target date funds for much of the Class Period and then continued to breach their fiduciary duties in 2015 by offering expensive retail shares of the 2020 and 2050 Funds.  Indeed, the 2020 and 2050 Funds offered to Plan participants were imprudent investments and should have never been added as Investment Options since there were many alternative better performing and less expensive target date funds available to select for the Plan.  Additionally, the Plan fiduciaries breached their fiduciary duties by failing to offer target date funds for people who are scheduled to retire at times other than 2020 or 2050.  If the Plan was to offer target date funds it should have offered funds covering all Plan participant age groups.

91.     For example, the Plan's fiduciaries could have easily offered the lower cost institutional class shares of the 2050 Fund ($0.91 expense ratio) instead of the retail shares ($1.16 expense ratio) or could have lowered costs by setting up a collective trust.  Nevertheless, even offering the institutional shares of the 2050 Fund would have been imprudent since many other better performing and less expensive unaffiliated target date funds were available at the time, as reflected in the below chart:

**INVESCO ERISA**
**Invesco Balanced-Risk Retirement 2050 Fund Class A (TNEAX) As Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| **TNEAX** | **10.16%** | **10.47%** | **2.42%** | **8.30%** | **-6.45%** | **16.00%** | **13.16%** | **65.76%** | **7.49%** |
| American Funds 2050 Target Date Retirement Fund Class A (AALTX) | -2.59% | 16.38% | 26.12% | 6.72% | 0.35% | 7.96% | 22.18% | **101.97%** | 10.56% |
| +/-TNEAX | -12.75% | 5.91% | 23.70% | -1.58% | 6.80% | -8.04% | 9.02% | 36.21% | 3.08% |
| JPMorgan SmartRetirement 2050 Fund Class A (JTSAX) | -5.02% | 18.00% | 22.76% | 7.55% | -1.79% | 6.47% | 21.80% | **88.46%** | 9.48% |
| +/-TNEAX | -15.18% | 7.53% | 20.34% | -0.75% | 4.66% | -9.53% | 8.64% | 22.70% | 1.99% |
| Principal LifeTime 2050 Fund Class A (PPEAX) | -4.36% | 17.00% | 23.37% | 5.83% | -1.08% | 5.20% | 21.66% | **84.97%** | 9.18% |
| +/-TNEAX | -14.52% | 6.53% | 20.95% | -2.47% | 5.37% | -10.80% | 8.50% | 19.21% | 1.70% |
| BlackRock LifePath Dynamic 2050 Fund Investor A Shares (LPRFX) | -4.06% | 15.80% | 19.48% | 5.47% | -2.65% | 7.95% | 22.48% | **80.20%** | 8.78% |
| +/-TNEAX | -14.22% | 5.33% | 17.06% | -2.83% | 3.80% | -8.05% | 9.32% | 14.44% | 1.29% |
| Fidelity Advisor Freedom 2050 Fund Class A (FFFLX) | -5.62% | 14.67% | 21.16% | 5.29% | -1.05% | 8.19% | 21.35% | **79.36%** | 8.70% |
| +/-TNEAX | -15.78% | 4.20% | 18.74% | -3.01% | 5.40% | -7.81% | 8.19% | 13.60% | 1.22% |

92.     As shown above, the 2050 Fund's cumulative return from 2011 through 2017 was only 65.76% compared to available alternative target date funds such as AALTX, JTSAX, PPEAX, LPRFX and FFFLX which returned, 101.97%, 88.46%, 84.97%,, 80.20% and 79.36% respectively during that period.  Specifically, each one of these alternative funds had better returns in 2012, 2013 and 2014, the years before the 2050 Fund was added to the Investment Options by a wide margin.

93.     Even the "worst" performing comparable fund in this group, FFFLX, achieved cumulative returns that were 13.6 more than the 2050 Fund representing approximately a 21 percent increase in returns when compared to the 2050 Fund.

94.     Similarly, the CAGR of the 2050 Fund amounted to only 7.49% during the 2011 to 2017 period.  By comparison, the alternative, non-proprietary funds achieved superior CAGRs of 10.56%, 9.48%, 9.18%, 8.78% and 8.70% respectively, during that period.  Furthermore, the 1.18% expense ratio of the retail shares of the 2050 Fund fees were higher than each of the above alternative non-proprietary target date funds.

95.     Each alternative investment was a more prudent investment considering (i) AALTX has an expense ratio of 0.77% with 55% greater returns; (ii) JTSAX has an expense ratio of 0.89% with 35% greater returns; (iii) PPEAX has an expense ratio of 1.08% with 29% greater returns; (iv) LPRFX has an expense ratio of 0.93% with 22% greater returns; and (v) FFFLX has an expense ratio of 1.00% with 21%  greater returns.

96.     Likewise, as of May 18, 2018, the 2020 Fund also performed poorly compared to its peers.  In the last ten years, the 2020 Fund has had trailing returns that have been no better than the bottom 75% of the Target-Date 2020 category.  As of May 18, 2018, its trailing returns are 5.06% for one year, 3.24% for three years, and 3.07% for five years.  In comparison, the trailing returns of its benchmark during the same time were 8.84% for one year, 5.63%  for three years, and 6.25% for five years. The 2020 Fund should have never been offered to Plan participants.

**The Plan Fiduciaries Breached Their Fiduciary Duties in Connection with the Collective Investment Trusts Offered by the Plan**

97.     During the Class Period, the Plan offered between seven and eleven proprietary collective trusts to Plan participants.  Even though the Plan was one of the largest defined contribution plans in the country, only approximately 5% of Plan Investment Options were low-fee collective trusts.  And some of the collective trusts, like the Plan's mutual fund and ETF offerings, suffered from poor performance.  Invesco's subsidiaries, Invesco Trust Co. and Invesco Advisers, were the manager and sub-manager for each of the collective trust investments and earned fees from Plan participants.

98.     Invesco could have, but did not, use its bargaining power as one of the largest retirement plans in the United States to create suitably prudent collective trust investments that had strong and consistent track records.  Instead, Invesco solely offered Plan participants collective trust investments that lagged behind that of peers in their same investment category.  Invesco did not remove, replace, or substitute these investment options during the Class Period.

99.     Set forth below are examples of Invesco's poorly performing collective trust offerings that remained as plan Investment Options during the Class Period, the Invesco 500 Index Trust Fund, the Invesco Mid Cap Growth Trust, and the Invesco Diversified Dividend Trust.

- 43 -

**The Invesco 500 Index Trust Fund**

100.   According to the Invesco Fund Profile, the objective of its 500 Index Trust Fund was to match the returns of the S&P 500 index as closely as possible.  The 500 Index Trust Fund served as a feeder fund into the State Street S&P 500 Flagship Series A mutual fund which, according to Morningstar, has a "large blend" investment style.

101.   Invesco Trust Co. is the investment manager of the Invesco 500 Index Trust Fund and State Street is the sub-advisor.  Plan participants received "net" returns in their accounts, less expenses paid to Invesco Trust Co. and State Street thereby diluting the "gross" returns Plan participants could have realized, if not for the fees charged to them.

102.   The 500 Index Trust Fund was a popular Investment Option during the Class Period and nearly $77 million in Plan assets were invested in this fund by 2016.

103.   As illustrated by the chart below, the 500 Index Trust Fund underperformed the S&P 500 Index each trailing year period from one to ten years.

| Trailing Returns (as of 3/31/2018) | 1 Year(%) | 3 Year (%) | 5 Year (%) | 10 Year (%) |
|---|---|---|---|---|
| S&P 500 Index | 13.99 | 10.78 | 13.31 | 9.49 |
| Invesco 500 Index Trust | 13.62 | 10.42 | 12.94 | 9.21 |
| *+/- Benchmark* | *- 0.37* | *-0.36* | *-0.37* | *-0.28* |

104.   The Plan fiduciaries offered this fund to Plan participants to promote Invesco's business to the detriment of Plan participants.  There were a large number of more prudent investment options in the same investment category with better trailing returns as of March 31, 2018.  A sample of those alternative options are shown in the below chart:

| Trailing Returns (as of 3/31/2018) | 1 Year (%) | 3 Year (%) | 5 Year (%) | 10 Year (%) |
|---|---|---|---|---|
| T. Rowe Price Capital Opportunity Fund (PRCOX) | 15.69 | 11.38 | 13.57 | 9.65 |
| +/- S&P 500 Trust | +2.07 | +0.92 | +0.63 | +0.44 |
| PRIMECAP Odyssey Stock Fund (POSKX) | 17.83 | 12.10 | 14.75 | 11.10 |
| +/- S&P 500 Trust | +4.21 | +1.68 | +1.81 | +1.89 |
| OakMark Fund (OAKMX) | 15.34 | 11.14 | 13.78 | 11.76 |
| +/- S&P 500 Trust | +1.72 | +0.72 | +0.84 | +2.27 |
| Glenmede Large Cap Core Portfolio (GTLOX) | 15.68 | 10.33 | 14.47 | 10.97 |
| +/- S&P 500 Trust | +1.69 | -0.09 | +1.53 | +1.76 |
| Parnassus Endeavor Investor (PARWX) | 12.22 | 12.48 | 16.02 | 14.12 |
| +/- S&P 500 Trust | - 1.4 | +2.06 | +3.08 | +4.91 |
| Goldman Sachs U.S. Equity Insights (GSELX) | 16.61 | 10.67 | 14.03 | 9.63 |
| +/- S&P 500 Trust | +2.99 | +0.25 | +1.09 | +0.42 |

### The Invesco Mid Cap Growth Trust

105.   The Invesco Mid Cap Growth Trust ("IMCG Trust") is categorized as a "growth equity" fund and was added to the collective trust portfolio of Investment

Options in 2015. The IMCG invests primarily in equity securities of mid-capitalization stocks. The IMCG Trust is designed to invest in securities that are considered by the IMCG Trust portfolio managers to have "strong earnings growth." Invesco Trust Co. is the investment manager of the IMCG Trust and Invesco Advisers is the sub-advisor. Plan participants earned "net" returns on their investments which accounted for expenses paid to Invesco Trust Co. and Invesco Advisers. These "net" returns were lower than the "gross" returns reported by the Investment Options.

106.  The IMCG Trust trailing returns have underperformed their benchmark since the trust has been in business. According to Invesco's website, the one and three-year trailing returns, as of March 31, 2018, are 16.80% and 6.54% respectively. The IMCG Trust substantially underperformed its benchmark, the Russell Mid Cap Growth Index, which had trailing returns of 19.74% and 9.17% for the same one year and three-year periods.[15]

107.  The Plan fiduciaries offered this option to Plan participants to promote Invesco's business to the detriment of Plan participants. There were a large number of more prudent investment options in the same investment category with better returns. A sample of those alternative options are shown in the below chart:

---

[15]  The IMCG Trust does not have 5 year or 10 year trailing returns due to the age of the Trust.

| Trailing Returns (as of 3/31/2018) | 1 Year (%) | 3 Year (%) |
|---|---|---|
| BlackRock Mid-Cap Growth Equity Portfolio (BMGAX) | 26.51 | 11.89 |
| *+/- IMCG Trust* | *+9.71* | *+5.35* |
| T. Rowe Price Mid Cap Growth Fund (RPMGX) | 20.12 | 11.38 |
| *+/- IMCG Trust* | *+3.32* | *+4.84* |
| Hartford MidCap Fund (HFMCX) | 21.13 | 11.01 |
| *+/- IMCG Trust* | *+4.33* | *+4.47* |
| Mass Mutual Select Mid Cap Growth Fund (MEFAX) | 18.72 | 10.17 |
| *+/- IMCG Trust* | *+1.92* | *+3.63* |
| Carillon Eagle Mid Cap Growth Fund (HAGAX) | 24.77 | 11.11 |
| *+/- IMCG Trust* | *+7.97* | *+4.57* |

### The Invesco Diversified Dividend Trust

108.  The Invesco Diversified Dividend Trust ("IDD Trust") is categorized as a "Large Value" fund and was added to the collective trust portfolio of Investment Options in 2014. The IMCG invests primarily in dividend paying equity securities that are considered "undervalued" by the IDD trust portfolio managers.

109.  Invesco Trust Co. is the investment manager of the IDD Trust and Invesco Advisers is the sub-advisor. According to the Plan SPD, Plan participants earned "net" returns on their investments which accounted for expenses paid to Invesco Trust Co. and Invesco Advisers. These "net" returns were lower than the "gross" returns reported by the Investment Options.

110.  As of March 31, 2018, the one year and three year trailing returns were 2.13% and 6.39%, respectively. The IDD Trust significantly underperformed IDD's

- 47 -

benchmark, the Russell 1000 Value Index, which had trailing returns of 6.95% and 7.88% during the same time periods.

111.   The Plan fiduciaries offered this fund to Plan participants to promote Invesco's business to the detriment of Plan participants.  There were a large number of more prudent investment options in the same investment category with better returns. A sample of those alternative options are shown in the below chart:

| Trailing Returns (as of 3/31/2018 | 1 Year | 3 Year |
|---|---|---|
| JP Morgan Large Cap Value Fund (OLVAX) | 8.49 | 10.50 |
| *+/- IDD Trust* | *+ 6.13* | *+4.12* |
| Vanguard Equity Income Fund (VEIPX) | 10.37 | 10.09 |
| *+/- IDD Trust* | *+8.24* | *+3.7* |
| DFA Large Cap Value Portfolio  (DFUVX) | 12.38 | 10.28 |
| *+/- IDD  Trust* | *+10.25* | *+3.89* |
| John Hancock Classic Value Fund (PZFVX) | 11.64 | 9.82 |
| *+/- IDD Trust* | *+9.51* | *+3.43* |
| American Funds Washington Mutual Fund (AWSHX) | 13.60 | 10.22 |
| *+/- IDD Trust* | *+11.47* | *+3.83* |

## The Plan Fiduciaries Breached Their Fiduciary Duties in Connection with the ISTF

112.   The Invesco Short Term Investment Fund ("ISTF") was an Invesco money market fund.  In April 2016, the DOL fined Invesco Trust Co. more than *$10 million* for using related party support agreements to keep the ISTF afloat and

maintain a $1 per share net asset value,, without adequately disclosing these affiliated support agreements to Plan participants.  Specifically, in its press release about the settlement with Invesco Trust Co. , the DOL stated the ISTF's value had fallen below $1 per share due to losses in the value of the fund's security holdings.  The DOL also stated that the fund did not adequately disclose these measures to ERISA plan investors, and that Invesco's actions resulted in losses to ERISA plan clients.

113.   In breach of their fiduciary duties, the Plan fiduciaries caused the Plan to offer Investment Options that invested in the ISTF.  Until April 2016, Defendants did not disclose that several of its investment options were exposed to the ISTF— needlessly subjecting Plan participants to significant risk without their knowledge.

114.   For example, during 2015, the Invesco Stable Value collective trust invested more than $233 million in the ISTF unbeknownst to Plan participants. Investing in the ISTF ran counter to the investment objective of the Stable Value Fund which is "to seek the preservation of principal and to provide interest income reasonably obtained under prevailing market conditions and rates, consistent with seeking to maintain required liquidity." The investments in the ISTF exposed Plan participants to a liquidity risk without their knowledge.

115.   During the Class Period, the following Plan collective trusts invested in the ISTIF without the knowledge of Plan participants.

| Collective Trust | 2014 Investment In ISTF |
|---|---|
| Invesco American Franchise Trust | $320,362 |
| Invesco Real Estate Securities Trust | $3,806,740 |
| Invesco Balanced Risk Allocation Trust | $597,164,197 |
| Invesco Diversified Dividend Trust | $2,771,269 |
| Invesco Mid Cap Growth Trust | $158,869 |
| Invesco Stable Value Trust | $233,553,659 |
| Invesco Growth and Income Trust | $998,898 |
| Invesco International Growth Equity Trust | $30,241,537 |

## CLASS ACTION ALLEGATIONS

116.    Plaintiff brings this action in this representative capacity on behalf of the

Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure

on behalf of himself and a Class defined as follows:

> All participants in the Invesco 401(k) Plan from May 25, 2012 to the
> date of Judgment (the "Class Period").  Excluded from the Class are
> Defendants and their families, the officers and directors of Invesco Ltd.
> and any of its subsidiaries, at all relevant times, members of their
> immediate families and their legal representatives, heirs, successors or
> assigns, and any entity in which Defendants have or had a controlling
> interest.

117.    The members of the Class are so numerous that joinder of all members is

impracticable.  The disposition of their claims in a class action will provide substantial

benefits to the parties and the Court.  As of December 31, 2016, the Plan had over

3,700 participants.

118.    There is a well-defined community of interest in the questions of law and

fact involved in this case.  Questions of law and fact common to the members of the

Class that predominate over questions that may affect individual Class members include, *inter alia*:

(a)    whether Defendants are fiduciaries of the Plan;

(b)    whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

(c)    whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d)    whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e)    the extent of damage sustained by Class members and the appropriate measure of damages.

119.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

120.    Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation.  Plaintiff has no interests that conflict with those of the Class.

121.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Breach of Fiduciary Duties in Violation of ERISA §404(a)
### Against the Invesco Plan Sponsor Defendants and the Benefits Committee
### Defendants

122.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

123.   The Benefits Committee Defendants were fiduciaries of the Plan under ERISA §3(21), 29 U.S.C. §1002(21), among other reasons, because the IBPC and its members were the named fiduciaries of the Plan and responsible for (i) establishment of the Plan's investment policy; (ii) the selection and monitoring of the Investment Options performance; (iii) determining the number and characteristics of the Investment Options; (iv) determining the administrative fees associated with Plan participant fund elections; (v) appointing and monitoring investment managers for the Investment Options.

124.   The Invesco Plan Sponsor Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) because they were  either designated in the Plan Document and the Trust Agreement as the Plan Sponsor and/or functioned as the Plan sponsor under ERISA as the single employer of a "controlled group" entity pursuant to 26 U.S.C. § 414.  The Invesco Plan Sponsor Defendants were responsible for ensuring that the Plan's proprietary and

affiliated Investment Options would not be prohibited under ERISA and whether the Plan's proprietary and affiliate investment options should be removed from the Plan.

125.   As fiduciaries of the Plan, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants were required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

126.   ERISA's duty of prudence required the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

127.   As described above, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants failed to properly evaluate the Plan's investments to

ensure that each of these investments remained prudent and failed to prudently monitor or remove the Investment Options that were no longer prudent.

128.   Under the Plan's Trust Agreement, both the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants were responsible for ensuring that Invesco's proprietary Investment Options were in compliance with ERISA, as prudent and loyal investments of the Plan.  Both the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants breached this portion of the Trust Agreement by maintaining poor performing and expensive proprietary Investment Options and needlessly offering nearly 200 proprietary and/or affiliated Investment Options that were imprudent since they could have been consolidated for the benefit of the Plan.

129.   At all relevant times herein, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants had a conflict of interest to select, retain and/or add proprietary Investment Options as investment options for the Plan that were imprudent.  Acting in their self-interest, rather than the best interests of the Plan and its participants, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants imprudently and disloyally selected and retained investment options that performed poorly and/or charged excessive fees that benefited Invesco affiliated entities, rather than Plan participants, despite the availability of superior – and readily available – investment alternatives as detailed herein.  A prudent fiduciary, in

possession of the same information, would have removed the many underperforming and/or expensive proprietary and affiliated Investment Options in the Plan, replaced them with more prudent, lower cost and/or better performing alternatives, and used the size, leverage and bargaining power of the Plan, which is one of the larger defined-contribution plans in the United States, to secure access to superior investment alternatives for Plan participants.

130.   The Invesco Plan Sponsor Defendants and the Benefits Committee Defendants breached their duties of prudence and loyalty with respect to the Plan by at least the following actions or omissions:

(a)   failing to properly investigate the availability of, and give appropriate consideration to, better performing and lower-cost funds with comparable or superior performance as alternatives to the Investment Options plagued with underperformance or high expenses;

(b)   failing to evaluate and monitor on a regular basis the performance and fees and expenses of the Investment Options and the adverse impact of excessive fees and expenses on the long-term performance of the Investment Options;

(c)   failing to recommend more prudent additions to the Investment Options, including better performing and less expensive non-proprietary investment options;

- 55 -

(d)     failing to implement and employ an ongoing process to monitor the performance, fees, and expenses of the Investment Options;

(e)     exposing Plan participants to the ISTF without their knowledge;

(f)     considering and being motivated in whole or in part by the promotion or success of the Investment Manager Defendants' business; and

(g)     failing to promptly remove the imprudent proprietary and/or affiliated Investment Options.

131.   Through these actions and omissions, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); and (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

132.   As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Class suffered substantial losses in the form of higher fees or lower

returns on their investments than they would have otherwise experienced. Additionally, and regardless of the losses incurred by Plaintiff or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of these Defendants' breaches of the duties of loyalty and prudence.

## COUNT II

**Prohibited Transactions in Violation of ERISA §406(a)(1) (A), (C) and (D) Against the Invesco Plan Sponsor Defendants, Benefits Committee Defendants and Investment Manager Defendants**

133.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

134.   ERISA §406(a)(1), 29 U.S.C. §1106(a)(1) provides, in pertinent part, that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)   sale or exchange, or leasing, of any property between the plan and a party in interest;

\*       \*       \*

(C)   furnishing of goods, services, or facilities between the plan and a party in interest;

- 57 -

(D)   transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.. .

135.   The Invesco Plan Sponsor Defendants and the Benefits Committee Defendants are fiduciaries of the Plan within the meaning of ERISA §§3(21), 29 U.S.C. §§1002(21) that caused the Plan to offer the proprietary and/or affiliated Investment Options and to continue offering the Investment Options as options in the Plan.

136.   As a fiduciary, an employer, and as the corporate parent of service providers for the Plan, Defendant Invesco is a party in interest under ERISA §3(14)(A), (C), (H), 29 U.S.C. §1002(14) (A), (C) and (H), respectively.

137.   As service providers to the Plan, the Investment Manager Defendants were parties in interest within the meaning of ERISA §3(14)(B), (H) and/or (I), 29 U.S.C. §1002(14) (B), (H) and/or (I).

138.   The Plan Sponsor Defendants and/or the Benefits Committee Defendants caused the Plan to almost exclusively select proprietary Invesco products as the Investment Options offered to Plan participants during and throughout the Class Period, even though the Investment Options, as identified above, were plagued by needlessly high expenses and underperformance.

139.   Since the Investment Manager Defendants were subsidiaries of Invesco, they must have known that those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest.

140.   These transactions were for more than reasonable compensation, not selected solely in the interests of Plan participants and/or were on terms less favorable than could have been procured if the transactions were the product of arm's-length negotiations and with outside investors.  As described throughout the Complaint, the compensation paid to parties in interest for retail classes of mutual funds in the Plan was also unreasonably high.  As one of the larger 401(k) Plans, in the United States and the issuer of the mutual funds, Invesco, at minimum, could have offered only institutional shares and/or collective trusts of these mutual fund options but failed to do so.  Additionally, these Defendants failed to consider or select lower cost, non-proprietary investment alternatives, including those offered by unaffiliated investment managers.

141.   By selecting the proprietary and/or affiliated Investment Options as the virtually exclusive options in the Plan and by maintaining these as the options in the Plan, the Invesco Plan Sponsor Defendants, the Benefits Committee Defendants and the Investment Manager Defendants caused the plan to engage in a prohibited

- 59 -

transaction in violation of ERISA §406(a)(1) (A), (C) and (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D).

142.   As parties in interest, the Investment Manager Defendants are liable for these violations of ERISA §406(a)(1) (A), (C) & (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D) pursuant to ERISA §502(a)(3).

143.   As a result of these prohibited transactions, the Investment Manager Defendants received, and Plaintiff and members of the Class paid, millions of dollars in the form of higher fees and lower returns on their investments than they would have without these prohibited transactions.

## COUNT III

### Prohibited Transactions in Violation of ERISA §406(b)(1) and (3) Against the Invesco Plan Sponsor Defendants, Benefits Committee Defendants, and Investment Manager Defendants

144.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

145.   ERISA §406(b), 29 U.S.C. §1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

(1) deal with the assets of the plan in his own interest or for his own account,

or…

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

146.   The Plan Sponsor Defendants and the Benefits Committee Defendants are fiduciaries of the Plan within the meaning of ERISA §§3(21) and 406(b)(1), 29 U.S.C. §§1002(21) and 1106(b)(1).

147.   The Invesco Plan Sponsor Defendants and the Benefits Committee Defendants dealt with the assets of a plan in their own interest or for their own account by selecting and maintaining the proprietary and/or affiliated Investment Options as the virtually exclusive Investment Options in the Plan despite their high fees and/or poor performance because the Plan Sponsor Defendants received the financial benefit resulting from the performance of its wholly-owned subsidiaries.

148.   Defendant Invesco received consideration for its own account through the receipt of investment management fees paid from the Investment Options in the Plan to its wholly owned subsidiaries and/or the profits derived from the fees generated by its wholly-owned subsidiaries in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).

149.   The Investment Manager Defendants were wholly-owned subsidiaries of Invesco during and throughout the Class Period.  As a result, the Investment Manager Defendants would have known that Invesco Plan Sponsor Defendants and the Benefits

Committee Defendants were dealing with the Plan in their own interest or for their own account by selecting and maintaining  proprietary and/or affiliated Investment Options as the virtually exclusive investment options in the Plan or that these fiduciaries received consideration for their own account by selecting and maintaining proprietary and/or affiliated Investment Options as the virtually exclusive investment options in the Plan.

150.   By selecting the proprietary and/or affiliated Investment Options as the virtually exclusive investment options in the Plan and by maintaining these as the options in the Plan, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants caused the plan to engage in a prohibited transaction in violation of ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3).

151.   With respect to, at minimum, the proprietary mutual funds needlessly offered with retail shares as well as other proprietary Investment Options offered by the Plan, the Invesco Plan Sponsor Defendants, Benefits Committee Defendants, and the Investment Manager Defendants engaged in prohibited transactions as follows:

(a)     by causing the Plan to engage in transactions that they know or should know constitute direct or indirect transfers of the Plan's assets to, or use of the Plan's assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. §1106(a)(1)(D);

(b)     by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of 29 U.S.C. §1106(b)(1);

(c)     by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3); and

(d)     by causing the Plan to pay a investment management fees, investment advisory fees, investment operation fees, or similar fees, which violated the terms of Prohibited Transaction Exemption 77-3.

152.   As parties in interest, the Invesco Plan Sponsor Defendants, Benefits Committee Defendants and the Investment Manager Defendants are liable for these violations of  ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3), pursuant to ERISA §502(a)(3).

153.   Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Invesco Plan Sponsor Defendants the Benefits Committee Defendants and the Investment Manager Defendants are liable to disgorge all amounts and profits received as a result of these prohibited transactions, and such other appropriate equitable relief as the Court deems proper.

## COUNT IV

**Breaches of Fiduciary Duties of Prudence and Loyalty in Violation of ERISA §404(a)**
**Against the Board of Directors Defendants**

154.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

155.    The Board of Directors Defendants were and continue to be fiduciaries of the Plan under ERISA §3(21) (A), 29 U.S.C. §1002(21) (A), because they were responsible for (i) ensuring all proprietary investments offered as part of the Investment Options were prudent, loyal, and in compliance with all rules of ERISA; (ii) appointing and removing members of the IBPC; (iii) monitoring the performance of IBPC members;(iv) delegating fiduciary authority under the Plan; and (v) making necessary changes to the Plan

156.    As a fiduciary of the Plan, the Board of Directors Defendants were and continue to be required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) discharging their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Consistent with these duties, the Board of Directors Defendants were required to ensure that the monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

157.   To the extent the Board of Directors Defendants delegated fiduciary monitoring responsibilities to other fiduciary Defendants, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

158.   The Board of Directors Defendants breached their fiduciary monitoring duties by, among other things:

(a)      failing to monitor and evaluate the performance of other fiduciary Defendants or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Defendants' election to load the Plan with proprietary Investment Options when superior non-proprietary investment alternatives were readily available elsewhere, as detailed herein;

(b)     failing to monitor the processes by which the Plan's investments were chosen, evaluated and retained, which would have alerted a prudent fiduciary to the preferential treatment Defendants gave to Invesco-affiliated funds out of self-interest, and not based on the best interest of the Plan's participants;

(c)     failing to monitor the process by which the Plan's investments were chosen, evaluated or retained, which would have alerted a prudent fiduciary of the excessive fees and/or underperformance of the proprietary Investment Options;

(d)     failing to monitor their appointees to ensure that they considered availability of comparable non-Invesco funds, including lower-cost funds with similar strategies and similar or superior performance and/or less expensive, better-performing funds than the proprietary and/or affiliated Investment Options; and

(e)     failing to remove fiduciaries whose performance was inadequate in that they continued to maintain costly and self-serving investments in the Plan, all to the detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class.

159.   As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiff and members of the Class have suffered substantial losses in the form of higher fees and/or lower returns on their investments than they would have earned by the prudent and loyal investment of Plan assets.

160.   Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Board of Directors Defendants are liable to disgorge all fees received from the Plan directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## COUNT V

### Co-fiduciary Liability Under ERISA §405
### Against the Invesco Plan Sponsor Defendants, the Benefits Committee Defendants, the Board of Directors Defendants, and the Investment Manager Defendants

161.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

162.   ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if:

(1)   he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)   by his failure to comply with ERISA §404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)   he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

163.  The Invesco Plan Sponsor Defendants, the Benefits Committee Defendants, the Board of Directors Defendants, and the Investment Manager Defendants were all fiduciaries of the Plan within the meaning of ERISA §402(a), 29 U.S.C. §1102(a), ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), or both.

164.  Each of these fiduciaries knew of each breach of fiduciary duty alleged herein arising out of the imprudent investment of the assets of the Plan in the proprietary and/or affiliated Investment Options and the associated breaches.  Yet, they knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

165.  As some if not all of the members of the Board and IBPC were employees, officers or directors of Defendant Invesco, their knowledge is imputed to Invesco.  Defendant Invesco knew of the breach of fiduciary duty by each of them arising out of the imprudent investment of the assets of the Plan in the proprietary and/or affiliated Investment Options and the associated breaches and Invesco had knowledge of its own fiduciary breaches in which these other fiduciaries participated. Yet, Defendant Invesco knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

## COUNT VI

### Knowing Participation in a Fiduciary Breach or
### Violation of ERISA Pursuant to ERISA 502(a)(3)
### Against Defendant Invesco and The Investment Manager Defendants

166.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

167.   ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) imposes liability not only on fiduciaries of the Plan but also on non-fiduciaries of the Plan who knowingly participate in fiduciary breaches or other violations of ERISA or the terms of the Plan. As such, the Investment Manager Defendants (even if they are not fiduciaries), can be held liable if either of them knowingly participated in the fiduciary breaches or violations of any fiduciary of the Plan.

168.   The Investment Manager Defendants would have known that each of the other Defendants were fiduciaries of the Plan as these other Defendants either were Invesco executives.  The knowledge of any such executives would be imputed to Invesco.

169.   The Investment Manager Defendants would have been aware of the foregoing breaches and prohibited transactions, including:

(a)   the proprietary and/or affiliated Investment Options had inferior investment performance;

- 69 -

(b)    the proprietary and/or affiliated Investment Options charged excessive fees;

(c)    the fiduciaries who selected the Investment Options had conflicts of interest;

(d)    the selection and continued offering of the proprietary and/or affiliated Investment Options was not in the best interests of the participants, but instead the primary purpose of offering them as an investment option was to increase the assets under management, to increase the fees charged and the profits of Invesco; Invesco Advisers, Invesco Trust Co, and PowerShares; and

(e)    several proprietary Investment Options they managed were invested in the ISTF despite the obvious imprudence in doing so.

170.   Despite knowledge of these breaches and violations, the Investment Manager Defendants proceeded to engage in the transactions and receive fees.

171.   By knowingly participating in these breaches and violations, the Investment Manager Defendants are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto) and/or is subject to other appropriate equitable relief.

## ENTITLEMENT TO RELIEF

172.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

173.    By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that each of the Defendants who are fiduciaries of the Plan have breached their fiduciary duties under ERISA;

B.    Ordering each fiduciary found to have breached his/her/its fiduciary duties to the Plan to jointly and severally restore all losses to the Plan that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §405;

C.      Entering an order requiring: (a) the disgorgement of profit made by any Defendant; (b) declaring a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties, or violations of ERISA, or any non-fiduciary Defendant who knowingly participated in that breach or violation; (c) requiring the Plan to divest itself of investments in the imprudent Investment Options; and (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D.      Ordering, pursuant to ERISA §206(d)(4), 29 U.S.C. §1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plan;

E.      Removing any breaching fiduciaries as fiduciaries of the Plan and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiff or any member of the Class is a participant or beneficiary;

F.      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of the Plan's investments and/or selection of investment options and/or to oversee the divestment of the Plan's investments;

G.      Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

H.     Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I.     Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest;

J.     Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(3) or any relief to which Plaintiff and the Class are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

K.     Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

DATED:  May 24, 2018            ROBBINS GELLER RUDMAN
                                  & DOWD LLP
                                JOHN C. HERMAN
                                Georgia Bar No. 348370
                                CARLTON R. JONES
                                Georgia Bar No. 940540


                                      /s/ *John C. Herman*
                                JOHN C. HERMAN

                                3424 Peachtree Road, N.E., Suite 1650
                                Atlanta, GA  30326
                                Telephone:  404/504-6500
                                404/504-6501 (fax)
                                jherman@rgrdlaw.com
                                cjones@rgrdlaw.com

- 73 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
 SAMUEL H. RUDMAN
(*pro hac vice* to be filed)
EVAN J. KAUFMAN
(*pro hac vice* to be filed)
JORDAN D. MAMORSKY
(*pro hac vice* to be filed)
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com
jmamorsky@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
Georgia Bar No. 262062
WILLIAM W. STONE
Georgia Bar No. 273907
DAVID A. WEISZ.
Georgia Bar No. 134527
40 Powder Springs Street
Marietta, GA 30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com
williams@johnsonfistel.com
davidw@johnsonfistel.com

*Attorneys for Plaintiff*