UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DIEGO CERVANTES, Individually and
on Behalf of the Invesco 401(k) Plan
and All Others Similarly Situated,

                Plaintiff,

    vs.

INVESCO HOLDING COMPANY
(US), INC.; INVESCO LTD.;
INVESCO NATIONAL TRUST
COMPANY; INVESCO ADVISERS,
INC.; INVESCO BENEFITS PLAN
COMMITTEE; SUZANNE
CHRISTENSEN; JOHN COLEMAN;
WASHINGTON DENDER; PETER
GALLAGHER; DAVID GENOVA;
DOUGLAS SHARP; BEN UTT; GARY
WENDLER; KEVIN M. CAROME;
LOREN M. STARR; and JOHN
DOES 1-20,

                Defendants.

Civil Action No. 1:18-cv-02551-AT

CLASS ACTION

AMENDED COMPLAINT FOR
LIABILITY UNDER ERISA

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................1

JURISDICTION AND VENUE ...........................................................5

PARTIES...........................................................................................6

    Plaintiff ...................................................................................6

    Defendants ..............................................................................6

    Invesco Ltd. ............................................................................6

    The Plan Sponsor Defendants..................................................7

    The Invesco Benefits Committee Defendants .............................8

    The Investment Manager Defendants.......................................10

    The Plan ................................................................................10

    The "Doe" Defendants............................................................11

DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA .....................11

    The Duties of Loyalty and Prudence ........................................11

    Fiduciaries Are Required Under ERISA to Act in the Best Interest of
    Plan Participants When Selecting and Maintaining Investment
    Options..................................................................................14

    Co-Fiduciary Liability ............................................................15

SUBSTANTIVE ALLEGATIONS ......................................................16

    The Plan ................................................................................16

    The Plan Investment Options ..................................................19

**Page**

The Self-Directed Schwab Account ............................................................23

Defendants Acted to Benefit Invesco to the Detriment of the Plan and
Plan Participants ............................................................26

The Plan Investments Were Imprudent and the Result of an Imprudent
Process ............................................................27

Invesco Emerging Markets Equity Trust and Invesco Developing
Markets Fund ............................................................28

Invesco High Yield Bond Fund ............................................................31

Invesco American Franchise Fund ............................................................32

Invesco Diversified Dividend Fund ............................................................35

Invesco Mid Cap Growth Trust ............................................................37

Investments in the Invesco Short-Term Investment Fund Were
Imprudent ............................................................40

Restricting the Schwab Account to PowerShares ETFs Was the Result
of an Imprudent Process ............................................................41

The Inclusion of Expensive Versions of Plan Investments Through the
Schwab Account Was the Result of an Imprudent Process ............................................................43

CLASS ACTION ALLEGATIONS ............................................................44

COUNT I ............................................................46

Breach of Fiduciary Duties in Violation of ERISA §404(a) Against
the Plan Sponsor Defendants and the Benefits Committee Defendants ........46

COUNT II ............................................................52

**Page**

Breach of Fiduciary Duties in Violation of ERISA §404(a) Against
the Plan Sponsor Defendants for Failure to Monitor Other Fiduciaries .......52

COUNT III .................................................................................................55

Prohibited Transactions in Violation of ERISA §406(a)(1) (A), (C)
and (D) Against Defendant Invesco, the Plan Sponsor Defendants, the
Benefits Committee Defendants and the Investment Manager
Defendants .................................................................................................55

COUNT IV .................................................................................................58

Prohibited Transactions in Violation of ERISA §406(b)(1) and (3)
Against Defendant Invesco, the Plan Sponsor Defendants, the Benefits
Committee Defendants, and the Investment Manager Defendants ..............58

COUNT V ...................................................................................................62

Co-fiduciary Liability Under ERISA §405 Against the Plan Sponsor
Defendants, the Benefits Committee Defendants, and the Investment
Manager Defendants ...................................................................................62

COUNT VI .................................................................................................63

Knowing Participation in a Fiduciary Breach or Violation of ERISA
Pursuant to ERISA 502(a)(3) Against Defendant Invesco and the
Investment Manager Defendants .................................................................63

ENTITLEMENT TO RELIEF .......................................................................65

PRAYER FOR RELIEF ..............................................................................66

Plaintiff brings this action individually, on behalf of a class of all participants in Invesco Ltd.'s 401(k) Plan (the "Plan") between May 25, 2012 to the date of Judgment (the "Class Period"), and on behalf of the Plan, for breach of fiduciary duty and prohibited transactions under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §1001, *et seq*. ("ERISA"), against the Defendants, as defined below.  As alleged herein, Defendants have breached their fiduciary duties of prudence and loyalty with respect to the Plan, and entered into prohibited transactions in violation of ERISA, to the detriment of the Plan and its participants and beneficiaries.

## NATURE OF THE ACTION

1.     Invesco Ltd. ("Invesco") is an investment management firm that offers mutual funds and other types of investment products to customers.  The Plan is offered to employees of Invesco's wholly-owned subsidiaries.  ERISA, which regulates the operation of the Plan, requires plan fiduciaries to act solely in the interest of the Plan's participants and beneficiaries.  To meet their fiduciary obligations, the Plan's fiduciaries are required to establish and maintain a prudent process to search the market for the best investment options for Plan participants and to monitor the Plan's investment options on an ongoing basis.

2.      Defendants did not consider or act in the best interest of the Plan and its participants throughout the Class Period.  Instead, Defendants put their interests before the Plan participants by treating the Plan as an opportunity to promote and generate fees from proprietary investment products offered by Invesco and its subsidiaries.  Instead of engaging in a prudent process to benefit the interests of Plan participants, Defendants used Plan participants as a captive market for Invesco's proprietary investment products to benefit and enrich Invesco and its affiliates.

3.      Participants in the Plan were entitled to save for retirement by choosing from an assortment of investment funds selected for the Plan (the "Plan Investments"). Plan participants were also able to invest in securities other than those offered in the Plan as Plan Investments by opening a self-directed brokerage account with the brokerage firm Charles Schwab & Co., Inc. (the "Schwab Account").

4.      In structuring the Plan, the Plan fiduciaries acted to solely benefit Invesco and its affiliate entities to the detriment of the Plan participants in connection with both the Plan Investments and the Schwab Account.

5.      The Plan fiduciaries filled the Plan with Invesco mutual funds and collective investment trust ("CITs") in breach of their fiduciary duties.  During the Class Period, between 55% to 68% of the Plan Investments were affiliated with Invesco and 100% of the actively managed Plan Investment choices in key investment

categories were affiliated with Invesco, even though these Plan investment options performed worse and/or had higher fees than other comparable unaffiliated investment options.

6.      Furthermore, the Plan fiduciaries violated their fiduciary duties in connection with the Schwab Account.  The Schwab Account is a full service brokerage account that could have afforded Plan participants the opportunity to invest in a wide assortment of investments, including all publicly listed equity securities, and thousands of ETFs.  But during the Class Period, Plan fiduciaries restricted the investment options available to Plan participants which benefited Invesco and harmed Plan participants.

7.      The Plan's fiduciaries modified the features of the Schwab Account to prevent Plan participants from purchasing any publicly listed equity securities other than ETFs affiliated with Invesco.  Plan participants were not able to purchase any blue chip common stocks or ETFs offered by Invesco's largest competitors, like BlackRock, Vanguard and State Street, even though those ETFs may have been more liquid, had lower fees or a better track records, or were in investment categories not offered by Invesco.  The Schwab Account was set up so that any Plan participant who sought to invest in a liquid security that could be traded while the market was open was forced to invest in an Invesco-affiliated ETF.

8.     As alleged herein, Defendants acted in their own interests to the detriment of Plan participants.  Instead of carefully examining and selecting the most prudent investment options for the Plan or prudently monitoring the Plan to eliminate its poor investment options, Defendants caused a majority of Plan Investments to consist of Invesco-affiliated mutual funds and CITs, and limited the Schwab Account to Invesco affiliated ETFs, enabling Invesco and its subsidiaries to earn lucrative fees, increase its assets under management, and serve business interests unrelated to the benefit of Plan participants.  Defendants breached their fiduciary duties and engaged in prohibited transactions in other ways as well, as alleged below.

9.     To remedy these fiduciary breaches and prohibited transactions, Plaintiff, individually and as a representative of a Class of participants and beneficiaries in the Plan, brings this action on behalf of the Plan to recover all losses resulting from Defendants' breaches of fiduciary duty and other ERISA violations and restore to the Plan any profits made by the fiduciaries or the persons and/or entities who knowingly participated in the fiduciaries' imprudent and disloyal use of Plan assets.  In addition, Plaintiff seeks such other equitable or remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action pursuant to 29 U.S.C. §132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of a plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and it has exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

12.     Venue is proper is this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan was and is administered in Atlanta, Georgia within this District, violations of ERISA took place in this District, and/or a defendant resides or may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because a defendant resides and/or does business in this District and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiff**

13.     Plaintiff Diego Cervantes has been a Plan participant during the Class Period and invested in Plan Investments affiliated with Invesco. Plaintiff Cervantes has suffered financial harm and has been injured by Defendants' unlawful conduct as described herein.  Furthermore, Defendants have been unjustly enriched from the fees and expenses generated as a result of Plaintiff Cervantes' Plan Investments.

**Defendants**

**Invesco Ltd.**

14.     Defendant Invesco Ltd. ("Invesco") is an investment management company headquartered in Atlanta, Georgia.  Defendant Invesco operates its for-profit investment management business through its wholly-owned subsidiaries, Invesco Advisers, Inc. ("Invesco Advisers"), Invesco National Trust Company ("Invesco Trust Co."), and PowerShares Capital Management LLC ("PowerShares").

15.     During the Class Period, Invesco's investment management business was promoted by the Plan because a majority of the Plan's investment options were affiliated with Invesco and managed and sponsored by Invesco's subsidiaries: Invesco Advisers and Invesco Trust Co.  The Plan's fiduciaries, members of the Invesco Benefits Plan Committee ("IBPC") and Invesco Holding Company (US) Inc. ("IVZ

Inc.") board of directors, were Invesco officers which created a conflict of interest and an incentive to retain poor performing Invesco investment options managed and sponsored by Invesco affiliates.

**The Plan Sponsor Defendants**

16.     Defendant IVZ Inc. is a Delaware corporation and the named Plan Sponsor in the documents governing the Plan (the "Plan Documents").  According to the Plan Documents, Defendant IVZ Inc., as the Plan Sponsor, is responsible for ensuring the Plan's proprietary and affiliate investment options would not be prohibited under ERISA.

17.     Additionally, the Board of Directors of Defendant IVZ Inc. (the "Board") is responsible for overseeing the Plan's appointment and designation of Plan fiduciaries, the removal of fiduciaries, and the appointment and removal of the Plan administrator.

18.     The Board consisted of the following individual defendants during the Class Period, both of whom were senior executives of Invesco:

(a)     Kevin M. Carome, Invesco Senior Managing Director and General Counsel; and

(b)     Loren M. Starr, Invesco Chief Financial Officer and Senior Managing Director.

19.     The Defendants listed in ¶¶16-18 are referred to herein as the "Plan Sponsor Defendants."  At all relevant times herein, the Plan Sponsor Defendants were fiduciaries within the meaning of ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) because they had discretionary authority to evaluate the Plan's proprietary investment options and determine whether they should be removed from the Plan, exercised or possessed discretionary authority or discretionary control with respect to management of the Plan, and/or exercised or possessed authority or control with respect to management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

**The Invesco Benefits Committee Defendants**

20.     The IBPC is the Plan administrator and named fiduciary of the Plan.  The IBPC's responsibilities include, *inter alia*: (i) control, management and administration of the Plan; (ii) establishment of the Plan's investment policy; (iii) selecting and monitoring the Plan Investments available to Plan participants; (iv) responsibility for the management, disposition and investment of Plan assets; (v) the power to appoint and remove Plan Investment managers; and (vi) ensuring that the Plan complies with ERISA, including the duties of loyalty and prudence codified in ERISA 404(c).  As alleged below, the IBPC selected wholly-owned subsidiaries of Invesco to manage a majority of Plan Investments.

21.     During the Class Period, the IBPC consisted of the following individual Defendants, each of whom was a senior executive of Invesco:

(a)     Defendant Washington Dender, Head of Invesco Human Resources and chairperson of the IBPC;

(b)     Defendant Ben Utt, Managing Director of Invesco U.S. Institutional Sales;

(c)     Defendant Gary Wendler, Head of Invesco's Product Development and Investment Risk;

(d)     Defendant Suzanne Christensen, Head of Invesco Enterprise Risk & Analytics;

(e)     Defendant Peter Gallagher, Head of Invesco Retail Sales;

(f)     Defendant John Coleman, Invesco Managing Director and Chief Administrative Officer;

(g)     Defendant Douglas Sharp, Head of Invesco's EMEA Retail Group, who was removed as a member of the IBPC in October 2015; and

(h)     Defendant David Genova, Invesco Global Investments Director.

22.     The Defendants listed in ¶¶20-21 are referred to herein as the "Benefits Committee Defendants."  At all relevant times herein, the members of the IBPC (as well as the IBPC itself) were fiduciaries within the meaning of ERISA §3(21)(A),

29 U.S.C. §1002(21)(A) as a result of their membership on the IBPC and because they each exercised or possessed discretionary authority or discretionary control with respect to management of the Plan and/or exercised or possessed authority or control with respect to management or distribution of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

### The Investment Manager Defendants

23.     Defendants Invesco Advisers and Invesco Trust Co. (collectively, the "Investment Manager Defendants") are wholly-owned subsidiaries of Invesco. During the Class Period, the Investment Manager Defendants sponsored and managed the Plan Investments.   At all relevant times herein, the Investment Manager Defendants received compensation in connection with proprietary and/or affiliated mutual fund and CIT Plan Investments.  As the sponsor, investment advisor, and investment sub-advisor of the affiliated Plan Investments, the Investment Management Defendants are parties in interest to the Plan as defined by ERISA §3(14).

### The Plan

24.     The Plan is a Nominal Defendant and at all relevant times herein has been an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A), and a "defined contribution plan" or "individual account plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).  The Plan is named

as a nominal defendant pursuant to Fed. R. Civ. P. 19 to ensure that complete relief can be granted as to claims brought on behalf of the Plan.

**The "Doe" Defendants**

25.    To the extent there are additional officers and employees of Invesco, members of the Board, the IBPC, or other entities or persons who were fiduciaries, or parties in interest to the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "Doe" defendants include other individuals and entities who were fiduciaries of the Plan within the meaning of ERISA §§3(21) and/or 402(a)(1) during the Class Period and are personally liable under ERISA §409(a).

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

**The Duties of Loyalty and Prudence**

26.    ERISA imposes strict fiduciary duties of loyalty and prudence upon plan fiduciaries. ERISA §404(a)(1)(a) sets forth the duty of loyalty, which states that fiduciaries must discharge their duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defray reasonable expenses of administering the plan.

27.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants.[1]  As the Supreme Court has noted, "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons."  *Id*. at 224.

28.     Where fiduciaries have conflicting interests that raise questions regarding their loyalty, the fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries."[2]

29.     ERISA §404(a)(1)(b) also imposes a "prudent person" standard upon fiduciaries.[3]  This duty of prudence means that ERISA fiduciaries must discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use."[4]  The duty of prudence means that fiduciaries must not only select prudent investments, but that,

---

[1]     *Pegram v. Herdrich,* 530 U.S. 211, 235 (2000).

[2]     *Kanawi v. Bechtel Corp.*, No. 09-16253 (9th Cir. 2009) (DOL Amicus Brief).

[3]     This standard measures fiduciaries' investment decisions and disposition of assets.  *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation omitted).

[4]     ERISA §404(a)(1)(b).

they must monitor the investments to ensure they do not become imprudent over time.[5]

30.    In measuring the prudence of fiduciaries' conduct, courts state that the key element is the process for considering and examining relevant information.  As one court explained, "ERISA §404(a)(1)(B) requires only that the [fiduciaries] vigorously and independently investigate the wisdom of a contemplated investment; it matters not that the investment succeeds or fails, as long as the investigation is 'intensive and scrupulous and . . . discharged with the greatest degree of care that could be expected under all the circumstances by reasonable beneficiaries and participants of the plan.'"[6]

31.    Thus, to meet the prudent process requirement, fiduciaries must vigorously and thoroughly investigate the investment options to obtain relevant information and then base their decisions on the information obtained.  This means considering competing funds to determine which fund should be included in the plan's investment line-up.  "A fiduciary must engage in an objective, thorough, and

---

[5]     *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015).

[6]     *Donovan v. Walton*, 609 F. Supp. 1221, 1238 (S.D. Fla. 1985).

analytical process that involves consideration of the quality of competing providers and investment products, as appropriate."[7]

32.      In satisfying these duties, fiduciaries should consider a variety of funds and the expenses associated with the possible funds.[8]  Furthermore, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments."[9]  If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time."  *Id.*

**Fiduciaries Are Required Under ERISA to Act in the Best Interest of Plan Participants When Selecting and Maintaining Investment Options**

33.      To meet their fiduciary obligations, ERISA requires plan fiduciaries to establish and maintain a prudent process to search the market for the best investment options.   Moreover, ERISA requires fiduciaries to regularly monitor and review existing investment options to determine whether it is prudent to keep or remove those options from the Plan.   Where fiduciaries have conflicting interests that raise

---

[7]      72 Fed. Reg. 60453 (October 24, 2007) (Preamble).

[8]      *See Tibble v. Edison Int'l*, No. CV-07-5359-SVW, 2010 U.S. Dist. LEXIS 69119 (C.D. Cal. July 8, 2010) (noting that fiduciaries must engage in a thorough investigation of the merits of an investment and noting that the fiduciaries considered five investment criteria, including the expense ratio, when selecting funds).

[9]      *Tibble*, 135 S. Ct. at 1828.

questions about their loyalty to the Plan, they "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to ensure that they act in the best interests of the plan beneficiaries."[10]

**Co-Fiduciary Liability**

34.     ERISA §405(a) imposes explicit co-fiduciary liability on plan fiduciaries, provides for fiduciary liability for a co-fiduciary's breach: "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (2) if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

35.     ERISA §409(a) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan: "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties

---

[10]     *Kanawi v. Bechtel*, No. 09-16253 (9th Cir. 2009) (DOL Amicus Brief).

imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

36.     In addition to the duties of loyalty and prudence imposed by ERISA §404, certain transactions are expressly prohibited by ERISA §406, and are considered *per se* violations of ERISA because they entail a high potential for abuse.

37.     Each of the Defendants are subject to co-fiduciary liability under 29 U.S.C. §1105(a)(1)(3) because they enabled other fiduciaries to commit breaches of fiduciary duty through their appointment powers, failed to comply with 29 U.S.C. §1104(a)(1) in the administration of their duties, or failed to remedy the known breaches of duty carried out by other fiduciaries.

## SUBSTANTIVE ALLEGATIONS

**The Plan**

38.     The Plan, established and effective as of January 1, 2000, is a defined-contribution Plan for the Invesco subsidiaries: (i) IVZ Inc. (the Plan Sponsor); (ii) Invesco Management Group Inc.; (iii) Invesco Group Services, Inc.; and (iv) Invesco North American Holding, Inc. (collectively the "Plan Employers"). The

Plan provides retirement income for employees of the Plan Employers.  The amount of retirement income available to Plan participants is derived from the investment returns generated on contributions by or on behalf of Plan participants, less fees and expenses.  Eligible employees of the Plan Employers may participate in the Plan by contributing up to 75% of their eligible earnings to the Plan.

39.     The written instrument, within the meaning of ERISA §402, 29 U.S.C. §1102, by which the Plan is maintained is the Invesco 401(k) Plan (the "Plan Document"), amended as of January 1, 2015.  Under the Plan Documents, Charles Schwab Trust Company ("Schwab") is the directed trustee and custodian of the Plan, receiving both direct and indirect compensation from the Plan.

40.     According to the Plan Document, Defendant Invesco is the parent company of the Plan Sponsor, IVZ, Inc.  As of December 31, 2016, the Plan had over $890 million in assets, making it one of the largest 401(k) plans in the country.

41.     The IBPC is the named fiduciary of the Plan.  The IBPC is expressly responsible under the Plan Document for the: (i) control, management and administration of the Plan; (ii) establishment of the Plan's investment policy; and (iii) selection and monitoring of the Investment Funds available to Participants in the Plan.

- 17 -

42.     The IBPC is composed of senior Invesco executives who have an interest in promoting Invesco's asset management business.  For example, Defendant Ben Utt is the Invesco Director of U.S. Institutional Sales and Services, Defendant Peter Gallagher is Invesco's Head of U.S. Retail Sales, and Defendant David Genova is Invesco's Global Investments Director.  Each of these IBPC members has a conflict of interest with the Plan participants since a key part of their responsibilities involved increasing sales, fund inflows, assets under management, and profitability for Invesco. For example, the bonus performance criteria under the Invesco Executive Incentive Bonus Plan includes assets under management, net revenue yield on assets under management, operating revenues, and net asset flows.  The Plan fiduciaries on the IBPC have strong personal incentives to use Plan assets to positively impact Invesco's business even though their actions might negatively impact Plan participants.

43.     During the Class Period, Invesco generated fees and increased assets under management as a result of the inclusion and retention of proprietary Plan Investments.  According to the Plan Documents and Invesco's Fee and Investment Notices provided to Plan participants, Invesco-affiliated entities earned lucrative fees by charging Plan participants "operating expenses" in connection with their investments in proprietary Plan Investments.  The operating expenses were paid

indirectly from the participants' accounts on an annual basis, thereby diluting their value and enriching Invesco and its subsidiaries.

**The Plan Investment Options**

44.     Plan participants may elect to make before-tax contributions or after-tax (aka Roth) contributions or a combination of both.  New employees who are eligible to participate in the Plan who do not elect to be excluded from the Plan will be automatically enrolled as a participant in the Plan.

45.     According to the Plan's "Summary Plan Description" (the "SPD"), Plan participants are permitted to direct the investment of their funds into the Plan Investments, which are selected and monitored by the Benefit Committee Defendants and/or those who were delegated those responsibilities by the Plan Sponsor Defendants.  The Plan fiduciaries did not employ a careful and thoughtful process to select, offer or monitor prudent investment options to serve the best interests of Plan participants.  Rather, Defendants used the Plan to serve the business interests of Invesco by generating fees, increasing assets under management, and increasing the liquidity of its ETF products.

46.     First, during the Class Period, between 55% to 68% of all Plan Investments were affiliated with Invesco.  Second, Invesco-affiliated investment options were the exclusive investment option in key categories of actively managed

investments.  Specifically, if a Plan participant had sought an actively managed investment option during the Class Period, between 74% and 88% of those choices would have been limited to Invesco-affiliated options and 100% of the actively managed investment options in many key investment categories were affiliated with Invesco.  Below is a chart showing the percentage of all funds that were affiliated with Invesco as well as the percentage of actively managed funds that were affiliated with Invesco:

| Year | Total Options [11] | Invesco-affiliated | % Invesco-affiliated | Active Options | Invesco-affiliated (Active) | % Invesco-affiliated (Active) |
|------|------|------|------|------|------|------|
| 2012 | 25 | 15 | **60%** | 17 | 14 | **82%** |
| 2013 | 26 | 16 | **62%** | 18 | 15 | **83%** |
| 2014 | 31 | 21 | **68%** | 23 | 20 | **87%** |
| 2015 | 25 | 15 | **60%** | 17 | 14 | **82%** |
| 2016 | 27 | 15 | **55%** | 19 | 14 | **74%** |
| 2017 | 25 | 15 | **60%** | 16 | 14 | **88%** |

47.    Third, the only Plan Investment in numerous investment categories, regardless of whether they were passive or actively managed investments, were limited to investment options affiliated with Invesco.  The below chart lists each category of Plan Investments in which the only option was an Invesco-affiliated option:

---

[11]    This chart does not include the Invesco Stock Fund which was offered as part of the Plan until 2015.

| Investment Categories With Only Invesco–Affiliated Options | | | | | | |
|---|---|---|---|---|---|---|
| Category | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| High Yield Bond | X | X | X | X | X | X |
| World Allocation/ Allocation – 30% to 50% Equity | X | X | X | X | X | X |
| Large Blend | X | X | X | X | X | X |
| Mid-Cap Growth | X | X | X | X | X | X |
| Small Value | X | X | X | X | X | X |
| Small Growth | X | X | X | X | X | X |
| Foreign Large Growth | X | X | X | X | X | X |
| Diversified Emerging Mkts. | X | X | X | X | X | X |
| Stable Value/ Money Market-Taxable | X | X | X | X | X | X |

48.     In addition to the Invesco-affiliated investments, the Plan Investments

consisted of the Invesco Stock Fund (until 2015), seven to eight passive index funds

managed by State Street Global Advisors ("SSGA"), and depending on the year, a few

other non-affiliated mutual funds, including a fund that seeks to provide returns linked

to the rate of inflation, an alternative long and short fund, a bond fund and a mid-cap

value fund.  Thus, if a Plan participant wanted an actively managed investment in the

large growth, diversified emerging markets, or high yield bond categories, the only

options were poor performing Plan Investments affiliated with Invesco.  If a Plan

participant simply wanted to participate in the small cap growth, small cap blend,

large cap blend, diversified emerging markets, or stable value investment categories,

even with an index fund, they were also limited to Plan Investments affiliated with

Invesco.

49.     The manner in which the Plan invested funds that were not expressly directed by Plan participants was also set up to benefit Invesco to the detriment of Plan participants.  According to the SPD, to the extent a participant failed to direct a portion of their funds for investment, those funds will be automatically invested in a portfolio referred to as the "Moderately Conservative Model Portfolio" (the "MCMP").  As of September 2017, nearly 60% of the MCMP was invested in Invesco-affiliated investments.  As such, the Plan was structured so that a majority of funds that were not directed by Plan participants were automatically placed into Invesco Plan Investments.

50.     Defendants' strategy of generating investments in Invesco-affiliated investments was successful.  By December 31, 2016, $569,797,686 or 81% of investments by Plan participants were in Invesco-affiliated funds.[12]  This benefitted Invesco by increasing assets under management and generating associated fees.  Plan participants, however, were harmed due to the poor performance and/or high fees of the Invesco-affiliated funds relative to other more prudent non-Invesco investment options.

---

[12]     This number consists of the total investments in products offered as Plan Investments.

**The Self-Directed Schwab Account**

51.     If Plan participants are interested in purchasing securities other than those offered in the Plan as Plan Investments, they are permitted to open the Schwab Account (defined above), which is an individual self-directed brokerage account with the firm Charles Schwab, and direct up to 100% of their contributions to that account. Contrary to the statement in the SPD that the Schwab Account provides Plan participants with "the maximum amount of investment flexibility available," Defendants structured the account to *limit* investment options and to steer money into Invesco-affiliated investment products.  Thus, Defendants actively and imprudently took steps to structure the Schwab Account to benefit Invesco to the detriment of Plan participants.

52.     Indeed, the Schwab Account could have offered Plan participants the ability to invest in all publicly traded individual stocks and bonds, as well as thousands of ETFs from other ETF companies.  The Plan fiduciaries, however, severely restricted the Schwab Account so that Plan participants were not, and are not, permitted to purchase equity securities, foreign securities, limited partnerships, fixed income securities, or any of the thousands of ETFs other than those issued by Invesco-affiliated PowerShares.

- 23 -

53.     Even though Invesco offers the PowerShares ETFs through the Schwab Account, there are many other ETFs offered by significantly larger ETF companies, including Vanguard, BlackRock, and State Street.[13] A firm's ETF business is valued by various metrics, including number of ETFs, assets under management, and trading volume/liquidity of the ETFs.  PowerShares is viewed as the fourth largest ETF company, trailing at a distant fourth to Vanguard, BlackRock, and State Street.  It was, and continues to be, in the financial interest of Invesco to increase investments in its PowerShares ETFs.  Thus, even though there are thousands of ETFs, many of which have better track records and/or lower fees than the PowerShares ETFs, the Plan fiduciaries excluded those ETFs from the Schwab Account.

54.     Defendants acted in their own self-interest to limit the Schwab Account to PowerShares ETFs to the detriment of Plan participants.  Moreover, the Plan fiduciaries' failure to engage in a prudent process is shown by the imprudent limitations placed on the purchase of non-PowerShares ETFs.

55.     The selection of mutual funds offered to Plan participants through the Schwab Account was also the result of an imprudent process.  Even though Plan participants were able to purchase non-Invesco mutual funds through the Schwab

---

[13]     Even after acquiring Guggenheim Partners' ETF business in September 2017, Invesco is still the fourth largest ETF issuer in the United States.

Account, they were also able to purchase more expensive share classes of the same mutual funds offered as Plan Investments.  For example, the Plan offered the High Yield Bond Fund as a Plan Investment with an expense ratio of 0.68%.  Due to an imprudent process, however, Defendants permitted Plan participants to purchase through the Schwab Account a more expensive share class of that same fund with an initial sales charge of 4.25% and an expense ratio of 1.09%.

56.     Since Defendants acted to input restrictions on the Schwab Account, they should have also acted to limit the purchase of Invesco-affiliated funds.  Had the Plan fiduciaries acted in a prudent manner, they would have excluded from the Schwab Account those funds that were included in the Plan as Plan Investments in order to prevent Plan participants from unnecessarily paying higher fees and earning lower returns.  For example, as of December 31, 2016, investors held approximately $1,500,000 in the retail and investor shares of the Invesco High Yield Fund, Invesco Balanced Risk Allocation Fund, Invesco Developing Markets Fund, Invesco Floating Rate Fund, Invesco Diversified Dividend Fund and Invesco American Franchise Fund even though they could have purchased those same funds in the Plan, paid less in expenses, and achieved a higher return.

57.     Thus, the Plan fiduciaries failed to act prudently and served their own interest by restricting the ETFs that can be purchased through the Schwab Account

and by failing to restrict proprietary Invesco investment options that were also offered through the Plan.

**Defendants Acted to Benefit Invesco to the Detriment of the Plan and Plan Participants**

58.     The Plan fiduciaries failed to meet their fiduciary obligations to the Plan participants who trusted them to construct a Plan that prioritized their interests over Invesco's profits and that offered superior investment options and world-class investment management.  Defendants did not consider or act in the best interest of the Plan and its participants throughout the Class Period.  Instead, the Plan fiduciaries put their interests before Plan participants by treating the Plan as an opportunity to promote and generate fees for Invesco's propriety investment businesses.  Defendants acted to bolster Invesco's investment management business by constructing the Plan in a way so that money would be funneled to Invesco's financial products even though it was imprudent to do so.

59.     Invesco prioritized profit over fiduciary duty and saddled the Plan's participants with substandard proprietary mutual funds, CITs, and ETFs.  The Plan fiduciaries could have, but failed to, include investment options with comparable or better performance from unaffiliated fund managers.  Furthermore, the Plan fiduciaries breached their fiduciary duties by failing to remove imprudent investment options from the Plan or structure the Schwab Account to include unaffiliated ETFs

and exclude imprudent affiliated mutual funds.  The inclusion, retention, and addition of the Plan Investments and the investment options made available through the Schwab Account were the result of an imprudent process.

**The Plan Investments Were Imprudent and the Result of an Imprudent Process**

60.    The Plan was loaded with Invesco-affiliated products due to their affiliation with Invesco.  Defendants used Plan participants as a captive investor base to foster investments in Invesco-affiliated products and benefit Invesco as well as Invesco Advisers, Invesco Trust Co. and PowerShares.  The structure of the Plan as well as the Plan Investments were imprudent and the result of the failure of the Plan fiduciaries to engage in a prudent process.

61.    A fiduciary acting in the best interest of the Plan and its participants and with due care would not have added or retained many of the Plan Investments because of their poor performance and/or high fees compared with readily available non-affiliated investment options.  Prior to and during the Class Period, Invesco-affiliated funds in the Plan suffered from poor performance compared to readily apparent more prudent investment options.  Below are representative examples of Invesco-affiliated funds that were imprudent.  A prudent and loyal fiduciary under the same circumstances would not have selected, retained, or added the following imprudent investments.

- 27 -

**Invesco Emerging Markets Equity Trust and Invesco Developing Markets Fund**

62.     The Invesco Emerging Markets Equity Trust (the "Emerging Markets Trust" or "EMET") was a Plan Investment at the beginning of the Class Period.  The Emerging Markets Trust performed poorly prior to and during the Class Period.  For example, as of December 31, 2011, the EMET's one year trailing return of -24.27%, five year trailing return of 1.68%, and ten year trailing return of 9.67%, significantly underperformed its benchmark's (the "MSCI EM NR USD") one year return of -18.42% five year trailing return of 2.40%, and ten year trailing return of 13.86%.  According to the Fee and Investment Notices provided to Plaintiff and Plan participants, the EMET continued to underperform its benchmark during 2012 to 2014.

63.     During June 2014, the Plan replaced the EMET with another investment option.  A prudent fiduciary would have looked to the market for the best available options.  The Plan's fiduciaries, however, did not act as prudent fiduciaries.  Rather, they substituted the EMET for another proprietary investment option affiliated with Invesco, the Invesco Developing Markets Fund (the "Developing Markets Fund" or "GTDFX").  The Invesco Developing Markets Fund, like the Emerging Markets Trust, had a poor track record and was not a prudent investment selection.

64.     The Developing Markets Fund was not only imprudent because of performance – it was also imprudent because of its high fees.  The EMET was a CIT with operating expenses of 0.21%.  While a prudent fiduciary would have substituted EMET for a better performing investment option with similar if not lower expenses, the Plan fiduciaries selected a proprietary mutual fund GTDFX which not only had a track record of poor performance, but had an operating expense ratio of 1.01% – **_nearly 5 times more expensive than EMET_**.

65.     In the year before GTDFX was added to the Plan, it lost 2.81% versus a gain of 15.29% for its benchmark, the "MSCI ACWI EX USA NR USD," placing the GTDFX in the bottom 58% of comparable emerging market mutual funds.  Then, in 2015, its first full year within the Plan, it lost 18.34%, well below its benchmark and placing it in the **_bottom 83 %_** of comparable Diversified Emerging Market mutual funds.

66.     An August 8, 2018 Morningstar analyst report describes the GTDFX's performance as "dismal."  As of September 4, 2018, it's one year trailing returns were -12.54%, placing it in the **_bottom 97%_** of all emerging market mutual funds.

67.     If Plan participants wanted to invest in an actively managed strategy in the Diversified Emerging Market investment category during the Class Period, the GTDFX and EMET were their only Plan options.

- 29 -

68.     If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the many better performing non-affiliated funds available with comparable investment strategies in the Diversified Emerging Markets Category.

69.     The following table summarizes the poor performance and cumulative harm to investors in the Developing Markets Fund as compared to other similar available investment alternatives that were not included in the Plan.

**INVESCO ERISA**
**Invesco Developing Markets Fund Class R6 (GTDFX) as Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|------|------|------|------|------|------|------|------|--------------------|-------------------------------|
| **GTDFX** | **-11.34%** | **19.66%** | **-2.81%** | **-2.82%** | **-18.34%** | **20.22%** | **30.86%** | **28.73%** | **3.67%** |
| | $0.89 | $1.06% | $1.03 | $1.00 | $0.82 | $0.98 | $1.29 | 28.73% | 3.67% |
| GuideMark Emerging Markets Fund Institutional Shares (GILVX) | -2.05% | 14.60% | 37.11% | 7.81% | -10.10% | 9.55% | 38.46% | 126.26% | 12.37% |
| *+/- GTDFX* | *9.29%* | *-5.06%* | *39.92%* | *10.63%* | *8.24%* | *-10.67%* | *7.60%* | *97.54%* | *8.70%* |
| Baron Emerging Markets Fund Institutional Shares (BEXIX) | -17.00% | 23.22% | 15.02% | 3.75% | -10.97% | 4.08% | 40.63% | 59.04% | 6.85% |
| *+/- GTDFX* | *-5.66%* | *3.56%* | *17.83%* | *6.57%* | *7.37%* | *-16.14%* | *9.77%* | *30.31%* | *3.18%* |
| American Century Emerging Markets Fund R6 Class (AEDMX) | -21.60% | 24.86% | 0.42% | -1.21% | -7.87% | 7.90% | 46.36% | 41.29% | 5.06% |
| *+/- GTDFX* | *-10.26%* | *5.20%* | *3.23%* | *1.61%* | *10.47%* | *-12.32%* | *15.50%* | *12.57%* | *1.39%* |

70.     As the chart above shows, the Developing Markets Fund cumulative return from 2011 through 2017 was only 28.73% compared to available alternative investments such as GILVX, BEXIX, and AEDMX which returned, 126.26%, 59.04%, and 41.29%, respectively during that period.

**Invesco High Yield Bond Fund**

71.     The Invesco High Yield Bond Fund (the "High Yield Fund") was a Plan Investment during the Class Period.  Between the start of the Class Period and May 2013, the Plan offered the R5 class of shares of the fund (ticker "AHIYX") and after that time offered the R6 class of shares (ticker "HYIFX").  If Plan participants wanted to invest in an actively managed strategy in the high yield bond investment category, the High Yield Fund was their only Plan option.

72.     Prior to and during the Class Period, the High Yield Fund performed poorly.  For example, it only earned 1.75% during 2011, placing it in the ***bottom 76*** of comparable mutual funds in the High Yield Bond Investment Category, according to Morningstar.  In 2014, the High Yield Fund only returned 1.77%, well below the performance of its benchmark "Bloomberg Barclays US Aggregate Bond TR USD" which returned 5.97%.  During 2016, the High Yield Fund returned only 11.74%, placing it in the ***bottom 74%*** of comparable mutual funds in the High Yield Bond investment category.

73.     If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the many better performing non-affiliated funds available with comparable strategies in the High Yield Bond investment category.

- 31 -

74. The following table summarizes the poor performance and cumulative harm to investors in the High Yield Bond Fund as compared to other available investment alternatives that were not included in the Plan:

**INVESCO ERISA**
**Invesco High Yield R6 (HYIFX) as Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| **HYIFX** | **1.75%** | **17.83%** | **7.35%** | **1.77%** | **-2.67%** | **11.74%** | **6.53%** | **51.75%** | **6.14%** |
| Lord Abbett High Yield R6 Shares (LHYVX) | 3.15% | 16.50% | 9.69% | 3.46% | -2.07% | 16.32% | 8.78% | 68.98% | 7.78% |
| *+/- HYIFX* | *1.40%* | *-1.33%* | *2.34%* | *1.69%* | *0.60%* | *4.58%* | *2.25%* | | |
| Ivy High Income Y Shares (WHIYX) | 6.17% | 16.88% | 10.19% | 1.48% | -7.37% | 16.74% | 8.00% | 62.06% | 7.14% |
| *+/- HYIFX* | *4.42%* | *-0.95%* | *2.84%* | *-0.29%* | *-4.70%* | *5.00%* | *1.47%* | | |
| AB High Income R Shares (AGDRX) | 1.76% | 18.27% | 6.28% | 2.75% | -4.23% | 14.73% | 7.49% | 55.22% | 6.48% |
| *+/- HYIFX* | *0.01%* | *0.44%* | *-1.07%* | *0.98%* | *-1.56%* | *2.99%* | *0.96%* | | |
| PGIM High Yield R Shares (JDYRX) | 4.53% | 13.78% | 6.69% | 2.31% | -3.11% | 14.70% | 7.19% | 54.67% | 6.43% |
| *+/- HYIFX* | *2.78%* | *-4.05%* | *-0.66%* | *0.54%* | *-0.44%* | *2.96%* | *0.66%* | | |

75. As the chart above shows, the High Yield Bond Fund's cumulative return from 2011 through 2017 was only 51.75%, compared to available alternative investments such as LHYVX, WHIYX, AGDRX, and JDYRX which returned, 68.98%, 62.06%, 55.22%, 54.67% respectively, during that period.

**Invesco American Franchise Fund**

76. The Invesco American Franchise Fund was a Plan investment option offered to Plan participants during the Class Period. It was first offered to Plan participants as a mutual fund, the American Franchise Fund R6 ("VAFFX"), which was managed by Invesco Advisers. In November 2014, the Plan moved the Plan assets from VAFFX into the Invesco American Franchise Trust (the "AFT"), which is

managed by Invesco Trust Co. and sub-managed by Invesco Advisers.  During the Class Period, if Plan participants wanted to invest in an actively managed strategy in the large growth investment category, the VAFFX and AFT were their only Plan options.

77.    Before and during the Class Period, the American Franchise Fund performed worse than comparable mutual funds in the same Large Growth investment category.  For example, according to Morningstar, in 2009, VAFFX performed 4.54% below the average of other mutual funds in the Large Growth investment category.  In 2011, VAFFX's returns were 8.84% worse than its benchmark, the S&P 500, and 4.27% worse than the average of comparable funds in the Large Growth investment category, according to Morningstar.  VAFFX continued to underperform in 2012 with returns that were 2.55% worse than its benchmark, and 1.89% worse than the average of comparable funds in the Large Growth investment category, according to Morningstar.  In 2014, VAFFX performed in the ***bottom 66%*** of mutual funds in the same Large Growth investment category, according to Morningstar, with returns 4.95% less than its benchmark.

78.    Plan participants continued to suffer from poor returns after the assets were transferred to the AFT.  According to Morningstar, in 2016, the AFT only achieved 2.11% in net returns, which were ***9.85% less*** than the performance of its

benchmark, the S&P 500.  And, as of July 31, 2018, its gross trailing returns, according to Morningstar in the one year and three year periods were 17.14% and 13.50%, respectively, underperforming the gross returns of the S&P 500 of 19.66% and 16.11%, respectively.

79.     If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the many better performing non-affiliated funds available with comparable strategies in the Large Growth category.

80.     The following table summarizes the poor performance and cumulative harm to investors in the American Franchise Fund as compared to other available investment alternatives that were not included in the Plan:

**INVESCO ERISA**
**Invesco American Franchise Trust as Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|---|---|
| **Invesco American Franchise Trust** | **-6.73%** | **13.45%** | **40.40%** | **8.74%** | **5.42%** | **2.11%** | **27.34%** | **121.43%** | **12.03%** |
| T. Rowe Price Blue Chip Growth Trust | 1.67% | 18.67% | 41.57% | 9.34% | 11.27% | 1.15% | 36.46% | 186.84% | 16.25% |
| *+/- Invesco Am Franchise* | *8.40%* | *5.22%* | *1.17%* | *0.60%* | *5.85%* | *-0.96%* | *9.12%* | | |
| T. Rowe Price Growth Stock Trust | -0.83% | 19.98% | 39.54% | 9.83% | 11.51% | 2.09% | 34.46% | 179.10% | 15.79% |
| *+/- Invesco Am Franchise* | *5.90%* | *6.53%* | *-0.86%* | *1.09%* | *6.09%* | *-0.02%* | *7.12%* | | |
| Schwab Institutional Large Cap Growth Trust | -8.60% | 19.20% | 36.19% | 11.65% | 10.01% | 0.15% | 35.56% | 147.43% | 13.82% |
| *+/- Invesco Am Franchise* | *-1.87%* | *5.75%* | *-4.21%* | *2.91%* | *4.59%* | *-1.96%* | *8.22%* | | |

81.     As the chart above shows, the Invesco American Franchise cumulative return[14] from 2011 through 2017 was 121.43%, compared to available alternative CITs such as the T. Rowe Price Blue Chip Growth Trust, T. Rowe Price Growth Stock Trust, and Schwab Institutional Large Cap Growth Trust, which returned, 186.84%, 179.10%, and 147.43% respectively, during that period.

**Invesco Diversified Dividend Fund**

82.     The Diversified Dividend Fund was a Plan investment option offered to Plan participants during the Class Period.  It was first offered to Plan participants as a mutual fund, the Diversified Dividend Fund R6 ("LCEFX") managed by Invesco Advisers.  Then, in November 2014, the Plan moved the Plan assets in LCEFX to the Invesco Diversified Dividend Trust (the "DDT"), which is managed by Invesco Trust Co. and sub-managed by Invesco Advisers.

83.     Prior to and during the Class Period, the LCEFX consistently underperformed comparable mutual funds in the same investment category.  For example, according to Morningstar, in 2009 the fund returned 23.66%, which was 2.80% less than its benchmark the S&P 500.  Then, in 2011, the fund lost 0.20%, underperforming the 2.11% return of its benchmark.  During 2013, even though the

---

[14]     Due to limited availability of data, the American Franchise cumulative returns are net of all fees and tracks the performance of VAFFX to January 2016 and then the AFT from January 2016 to December 31, 2017.

LCEFX returned 29.42%, it substantially underperformed its peers and was in the **bottom 72%** of mutual funds in the same Large Value investment category, according to Morningstar.

84.    Plan participants continued to suffer poor returns from their investment in the DDT.  According to Morningstar, in 2015, the DDT lost 0.14%, underperforming its benchmark by 1.52%.  And, in 2017, the DDT's net return was 8.87%, which was 12.96% less than its benchmark, the S&P 500, and 8.33% less than the average of other comparable investments in the Large Value category.    According to Morningstar, as of July 31, 2018, DDT's gross trailing returns, in the one year and three year periods were 5.08% and 7.05%, respectively, compared to the gross returns of its benchmark, the S&P 500, which returned 19.66% and 16.11%, respectively.

85.    If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the many better performing funds available with comparable strategies.

86.    The following table summarizes the poor performance and cumulative harm to investors in the Diversified Dividend Plan investment option as compared to other available investment alternatives that were not included in the Plan:

**INVESCO ERISA**
**Invesco Diversified Dividend Trust as Compared to Peer Group Investments**

| Fund | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|------|------|------|------|------|------|------|------|--------------------|-------------------------------|
| **Invesco Diversified Dividend Trust** | **-0.20%** | **17.28%** | **29.42%** | **12.42%** | **2.20%** | **14.95%** | **8.87%** | **117.80%** | **11.76%** |
| Schwab Institutional Large Cap Value Trust | -3.09% | 21.51% | 38.50% | 10.02% | -4.81% | 20.22% | 17.29% | 140.86% | 13.38% |
| *+/- Invesco Divers Div* | *-2.89%* | *4.23%* | *9.08%* | *-2.40%* | *-7.01%* | *5.27%* | *8.42%* | | |
| MFS Large Cap Value Trust | 0.43% | 16.67% | 36.19% | 10.81% | -0.24% | 14.50% | 18.02% | 138.37% | 13.21% |
| *+/- Invesco Divers Div* | *0.63%* | *-0.61%* | *6.77%* | *-1.61%* | *-2.44%* | *-0.45%* | *9.15%* | | |
| The Boston US Dynamic Large Cap Value Trust | -6.10% | 18.48% | 38.26% | 10.74% | -2.03% | 18.77% | 15.32% | 128.55% | 12.53% |
| *+/- Invesco Divers Div* | *-5.90%* | *1.20%* | *8.84%* | *-1.68%* | *-4.23%* | *3.82%* | *6.45%* | | |
| AB US Diversified Value Trust | -1.57% | 15.68% | 36.89% | 13.55% | -2.62% | 10.79% | 18.79% | 126.81% | 12.41% |
| *+/- Invesco Divers Div* | *-1.37%* | *-1.60%* | *7.47%* | *1.13%* | *-4.82%* | *-4.16%* | *9.92%* | | |

87.     As the chart above shows, the Invesco Diversified Dividend Plan's cumulative return[15] from 2011 through 2017 was 117.80%, compared to available alternative CITs such as the Schwab Institutional Large Cap Value Trust, MFS Large Cap Value Trust, Boston U.S. Dynamic Large Cap Value Trust, and AB U.S. Diversified Value Trust, which returned, 140.86%, 138.37%, 128.55%, 126.81%, respectively, during that period.

**Invesco Mid Cap Growth Trust**

88.     The Invesco Mid Cap Growth Fund was offered to Plan participants during the Class Period.  It was first offered to Plan participants as a mutual fund, the Mid Cap Growth R6 Fund ("VGRFX") managed by Invesco Advisers.  Then, in November 2014, the Plan moved the Plan assets in VGRFX into the Invesco Mid Cap

---

[15]     Due to limited availability of data, the Diversified Dividend returns are net of all fees and tracks the performance of LCEFX to January 2016 and then DDT from January 2016 to December 31, 2017.

Growth Trust (the "MCGT"), managed by Invesco Trust Co. and sub-managed by Invesco Advisers.  If Plan participants wanted to invest in an actively managed strategy in the Mid Cap Growth investment category,  VGRFX and MCGT were their only Plan options.[16]

89.    Prior to and during the Class Period, VGRFX performed worse than comparable mutual funds in the same investment category.  For example, according to Morningstar, in 2008, the fund lost 48.40%, underperforming its benchmark by 11.40% and the average returns of mutual funds in the Mid Cap investment category by 4.63%.  In 2011, the fund lost 9.10%, underperforming its benchmark by 11.22% and the average returns of mutual funds in the Mid Cap investment category by 5.14%.

90.    Plan participants continued to suffer from poor returns from their investment in the MCGT.  For example, in 2015 and 2016, the MCGT underperformed its benchmark, the S&P 500, by 6.69% and 11.73%, respectively. According to Morningstar, as of July 31, 2018, MCGT's gross trailing returns, in the one year and three year periods, were 17.47% and 8.00%, respectively, which

---

[16]    In 2013, the Invesco Dynamics Fund R6 was "reorganized" into the Mid Cap Growth Fund.

underperformed the trailing returns of its benchmark, the S&P 500, which were 19.66% and 16.11% respectively, during the same periods.

91.    If the Plan fiduciaries had faithfully executed their fiduciary duties to the Plan and its participants, they would have selected one of the many better performing funds available with comparable strategies.

92.    The following table summarizes the poor performance and cumulative harm to investors in the Invesco Mid Cap Growth Trust as compared to other available investment alternatives that were not included in the Plan:

**INVESCO ERISA**
**Invesco Mid Cap Growth Trust as Compared to Peer Group Investments**

| Fund | 2013 | 2014 | 2015 | 2016 | 2017 | Cumulative Returns | Compounded Annual Growth Rate |
|---|---|---|---|---|---|---|---|
| **Invesco Mid Cap Growth Trust** | **37.25%** | **8.39%** | **1.68%** | **0.23%** | **22.74%** | **86.09%** | **13.23%** |
| T. Rowe Price US Mid Cap Growth Equity Trust | 37.76% | 13.93% | 7.37% | 7.13% | 25.68% | 126.91% | 17.81% |
| *+/- Invesco Mid Cp Grwth* | *0.51%* | *5.54%* | *5.69%* | *6.90%* | *2.94%* | | |
| Wellington Mid Cap Opportunities Trust | 39.29% | 10.97% | 1.57% | 11.92% | 24.50% | 118.75% | 16.95% |
| *+/- Invesco Mid Cp Grwth* | *2.04%* | *2.58%* | *-0.11%* | *11.69%* | *1.76%* | | |
| Champlain Mid Cap Trust | 37.92% | 8.26% | 1.66% | 19.06% | 19.87% | 116.63% | 16.72% |
| *+/- Invesco Mid Cp Grwth* | *0.67%* | *-0.13%* | *-0.02%* | *18.83%* | *-2.87%* | | |
| Transamerica Partners Mid Growth Trust | 31.32% | 8.85% | -0.62% | 13.18% | 22.48% | 96.90% | 14.51% |
| *+/- Invesco Mid Cp Grwth* | *-5.93%* | *0.46%* | *-2.30%* | *12.95%* | *-0.26%* | | |
| Voya Mid Cap Growth Trust | 31.96% | 9.05% | 0.55% | 7.49% | 25.11% | 94.58% | 14.24% |
| *+/- Invesco Mid Cp Grwth* | *-5.29%* | *0.66%* | *-1.13%* | *7.26%* | *2.37%* | | |

93.    As the chart above shows, the Invesco Mid Cap Growth Trust cumulative return[17] from 2011 through 2017 was 86.09%, compared to available alternative CITs

---

[17]    Due to limited availability of data, the Invesco Mid Cap Growth cumulative returns are net of all fees and tracks the performance of MGRFX to January 2016 and then the MCGT from January 2016 to December 31, 2017.

such as the T. Rowe Price US Mid Cap Growth Equity Trust, Wellington Mid Cap Opportunities Trust, Champlain Mid Cap Trust, Transamerica Partners Mid Growth Trust, and Voya Mid Cap Growth Trust, which returned 126.91%, 118.75%, 116.63%, 96.90%, and 94.58%, respectively, during that period.

**Investments in the Invesco Short-Term Investment Fund Were Imprudent**

94.     During the Class Period, the Investment Manager Defendants caused Plan Investments to invest in the Invesco Short-Term Investment Fund (the "ISTIF"), a money market fund run by Invesco subsidiary Invesco Trust Co.  For example, the Invesco Stable Value Trust ("Stable Value Trust") and Invesco International Growth Equity Trust ("International Growth Trust") invested more than $200 million and $20 million in the ISTIF, respectively, at times during the Class Period.  The Investment Manager Defendants breached their fiduciary duties to the Plan and Plan participants by investing Plan assets in the ISTIF.

95.     During the Class Period, and up until 2016, the ISTIF undertook a series of improper measures that were not disclosed to Plan participants to ensure that the ISTIF's net asset value ("NAV") continued to trade at $1 per share even though the ISTIF's NAV had in reality fallen below $1 due to losses in the value of the ISTIF's holdings.  The measures taken by the ISTIF to artificially inflate its NAV included: (i) retaining a portion of the ISTIF's income that should have been distributed to

investors; and (ii) entering into a series of support agreements with an affiliate of Invesco to provide contingent financial support to the ISTIF.  The retention of distributions that should have gone to Plan Investments, such as the Stable Value Trust and International Growth Trust, benefitted Invesco by reducing the obligations of the Invesco affiliate that entered into the support agreements to the detriment of Plan participants and harmed the Plan's Investments by reducing the returns of the Invesco Stable Value Trust and International Growth Trust.

96.    The U.S. Department of Labor ("DOL") uncovered Invesco's improper conduct in connection with the ISTIF and claimed the manipulation of its NAV and related actions constituted a violation of ERISA.  On or about April 29, 2016, the DOL announced a settlement of more than $10.2 million with Invesco Trust Co. as a result of their improper conduction related to the ISTIF.  The fiduciaries of the Plan should not have permitted Plan assets to be invested in the ISTIF since it was manipulating its NAV and withholding distributions to Plan Investments.

**Restricting the Schwab Account to PowerShares ETFs Was the Result of an Imprudent Process**

97.    Defendants restricted the Schwab Account so that only the Invesco-affiliated PowerShares ETFs were available in order to boost Invesco's ETFs and to increase the volume of ETF shares traded, an important metric used by ETF investors. It was imprudent for the Plan to limit the purchase of ETFs to PowerShares because

there are many ETFs provided by other firms that have better performance and lower fees than PowerShares.

98.     For illustration purposes, below is a sampling of Invesco-affiliated ETFs available through the Schwab Account that suffered from poor performance relative to more prudent alternatives not offered through the Schwab Account:

| Investment Option | Investment Category | 1 Year Trailing Return[18] | 3 Year Trailing Return | 5 Year Trailing Return |
|---|---|---|---|---|
| FTSE RAFI Asia Pacific ex-Japan portfolio (PAF) | "Pacific/Asia ex-Japan stock" | 13.27 %<br>Category Rank:<br>**Bottom 82%** | 6.95% | 4.21%<br>Category Rank:<br>**Bottom 83%** |
| *+/- Benchmark* | | *-4.32%* | *0.71%* | *-2.29%* |
| DB G 10 Currency Harvest Fund  (DBV) | "Multicurrency" | 0.02 | -0.49%<br>Category Rank:<br>**Bottom 68%** | -2.33%<br>Category Rank:<br>**Bottom 85%** |
| *+/- Benchmark* | | *-1.49* | *-.88%* | *-1.83%* |
| Dynamic Biotechnology & Genome Portfolio (PBE) | "Health" | 18.54 | -3.09%<br>Category Rank:<br>**Bottom 88%** | 12.09%<br>Category Rank:<br>**Bottom 65%** |
| *+/- Benchmark* | | *-0.23%* | *-7.12%* | *-1.74%* |
| Global Agriculture Portfolio (PAGG) | "Natural Resources | 14.39%<br>Category Rank:<br>**Bottom 88%** | -1.59%<br>Category Rank:<br>**Bottom 88%** | -0.52%<br>Category Rank:<br>**Bottom 71%** |
| *+/- Benchmark* | | *-15.05%* | *-2.27%* | *-0.49%* |
| S&P Small Cap Information Technology Portfolio (PSCT) | "Technology" | 13.00%<br>Category Rank:<br>**Bottom 96%** | 15.39%<br>Category Rank:<br>**Bottom 77%** | 18.23%<br>Category Rank:<br>**Bottom 68%** |
| *+/- Benchmark* | | *-15.05%* | *-2.27%* | *-0.54%* |
| International Dividend Achievers Portfolio (PID) | "Foreign Large Value" | 9.58%<br>Category Rank:<br>**Bottom 66%** | -1.36%<br>Category Rank:<br>**Bottom 95%** | 1.60%<br>Category Rank:<br>**Bottom 93%** |
| *+/- Benchmark* | | *-1.12* | *-4.72%* | *-3.08%* |
| VRDO Tax Free Weekly Portfolio (PVI) | "Muni National Short" | 0.80% | 0.36%<br>Category Rank<br>**Bottom 90%** | 0.18%<br>Category Rank:<br>**Bottom 90%** |
| *+/- Benchmark* | | *-0.14%* | *-0.43%* | *-1.16* |
| S&P Emerging Markets Low Volatility Portfolio (EELV) | "Diversified Emerging Markets" | 12.47%<br>Category Rank:<br>**Bottom 73%** | 1.17%<br>Category Rank:<br>**Bottom 92%** | -0.28%<br>Category Rank:<br>**Bottom 91%** |
| *+/- Benchmark* | | *-1.11* | *-3.50* | *-2.72* |

---

[18]     Trailing returns for the one year, three year and five-year periods of the ETF investments in the above table were retrieved from Morningstar and are as of May 18, 2018.

99.    Had the Plan's fiduciaries considered the best interests of Plan participants and acted prudently, they would have enabled Plan participants to purchase ETF from firms other than Invesco.

**The Inclusion of Expensive Versions of Plan Investments Through the Schwab Account Was the Result of an Imprudent Process**

100.    The lack of a prudent process, as well as Defendants acting to benefit Invesco to the detriment of Plan participants, is shown by the inclusion of expensive share classes of mutual funds in the Schwab Account even though different – and less expensive – classes or versions of the same investments were offered as Investment Funds in the Plan.  As alleged above, the Plan fiduciaries took steps to modify the investment options available to Plan participants through the Schwab Account.  Since they were able to alter the options available through the Schwab Account, the Plan fiduciaries should have acted in the best interests of Plan participants by ensuring participants would not unnecessarily waste money on fees, and sacrifice performance as a result of those fees, by purchasing shares of Invesco mutual funds when shares of the same funds or investments could have been purchased with lower costs as Plan Investments.  Had Defendants not acted in their own interest, and had they acted prudently, they would have ensured that the Schwab Account did not offer more expensive classes of shares of Plan Investments.

101.    As reflected in the below chart, at various times during the Class Period,

Plan participants unnecessarily purchased expensive shares of Invesco-affiliated funds

through the Schwab Account even though less expensive (and better performing)

classes of those investments were available directly through the Plan:

| Fund Name | Plan Version | Schwab Version | Plan Net Expenses | Schwab Acct Net Expenses | Class A Sales Charge |
|---|---|---|---|---|---|
| Invesco High Yield Fund | Invesco High Yield Class R6 | Invesco High Yield Fund Class A | 0.68% | 1.09% | 4.25% |
| Balanced Risk Allocation Fund | Balanced Risk Allocation Trust | Balanced Risk Allocation Fund Class A | 0.01% | 1.22% | 5.50% |
| Invesco Mid Cap Growth Fund | Invesco Mid Cap Growth Fund Class R6 | Invesco Mid Cap Growth Fund Class A | 0.73% | 1.15% | 5.50% |
| Invesco Developing Markets Fund | Invesco Developing Markets Fund Class R6 | Invesco Developing Markets Fund Class A | 1.01% | 1.43% | 5.50% |
| Invesco Floating Rate Fund | Invesco Floating Rate Fund Class R6 | Invesco Floating Rate Fund Class A | 0.68% | 1.07% | 2.50% |
| Invesco Diversified Dividend Fund | Invesco Diversified Dividend Fund Class R6 | Invesco Diversified Dividend Fund Investor Class | 0.51% | 0.77% | (none) |
| Invesco American Franchise Fund | Invesco American Franchise Class R6 | American Franchise Fund Class A | 0.65% | 1.08% | 5.50% |

102.    The high fees associated with the proprietary investment options

available through the Schwab Account unjustly enriched Defendants to the detriment

of Plan participants.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action in this representative capacity on behalf of the

Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure

on behalf of himself and a Class defined as follows:

All participants in the Invesco 401(k) Plan from May 25, 2012 to the date of Judgment (the "Class Period"). Excluded from the Class are Defendants and their families, the officers and directors of Invesco Ltd. and any of its subsidiaries, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

104.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2016, the Plan had over 3,700 participants.

105.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include, *inter alia*:

(a)   whether Defendants are fiduciaries of the Plan;

(b)   whether Defendants breached their fiduciary duties of loyalty and prudence with respect to the Plan;

(c)   whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d)   whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

- 45 -

(e)    the extent of damage sustained by Class members and the appropriate measure of damages.

106.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

107.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation.  Plaintiff has no interests that conflict with those of the Class.

108.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Breach of Fiduciary Duties in Violation of ERISA §404(a)
### Against the Plan Sponsor Defendants
### and the Benefits Committee Defendants

109.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

110.   The Benefits Committee Defendants were fiduciaries of the Plan under ERISA §3(21), 29 U.S.C. §1002(21), among other reasons, because the IBPC and its members were the named fiduciaries of the Plan and responsible for: (i) establishment of the Plan's investment policy; (ii) the selection and monitoring of the Plan Investments' performance; (iii) determining the number and characteristics of the Plan

Investments; (iv) determining the administrative fees associated with Plan participant fund elections; and (v) appointing and monitoring investment managers for the Plan Investments.

111.   The Plan Sponsor Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) because they were either designated in the Plan Document and the Trust Agreement as the Plan Sponsor and/or functioned as the Plan Sponsor under ERISA.  The Invesco Plan Sponsor Defendants were responsible for ensuring that the Plan's proprietary and affiliated investment options would not be prohibited under ERISA and whether the Plan's proprietary and affiliate investment options should be removed from the Plan.

112.   As fiduciaries of the Plan, the Plan Sponsor Defendants and the Benefits Committee Defendants were required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

113.   ERISA's duty of prudence required the Plan Sponsor Defendants and the Benefits Committee Defendants to give appropriate consideration to those facts and circumstances that, given the scope of their fiduciary investment duties, they knew or should have known were relevant to the particular investments of the Plan and to act accordingly.  *See* 29 C.F.R. §2550.404a-1.  The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

114.   As described above, the Plan Sponsor Defendants and the Benefits Committee Defendants failed to properly evaluate the Plan's investments to ensure that each of these investments remained prudent and failed to prudently monitor or remove the Plan Investments that were no longer prudent.

115.   Under the Plan Documents, both the Plan Sponsor Defendants and the Benefits Committee Defendants were responsible for ensuring that Invesco's proprietary Plan Investments were in compliance with ERISA, as prudent and loyal investments of the Plan.  Both the Plan Sponsor Defendants and the Benefits Committee Defendants breached this portion of the Trust Agreement by retaining poor performing and expensive proprietary Plan Investments.

116.   At all relevant times herein, the Plan Sponsor Defendants and the Benefits Committee Defendants had a conflict of interest to select, retain and/or add

proprietary Plan Investments that were imprudent.  Acting in their self-interest, rather than the best interests of the Plan and its participants, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants imprudently and disloyally selected and retained Plan Investments that performed poorly and/or charged excessive fees that benefited Invesco and its affiliated entities, rather than Plan participants, despite the availability of superior – and readily available – investment alternatives as detailed herein.  A prudent fiduciary, in possession of the same information, would have removed the many underperforming and/or expensive proprietary and affiliated Plan Investments, replaced them with more prudent, lower cost and/or better performing alternatives, and used the size, leverage and bargaining power of the Plan, which is one of the larger defined-contribution plans in the United States, to secure access to superior investment alternatives for Plan participants.

117.   The Plan Sponsor Defendants and the Benefits Committee Defendants breached their duties of prudence and loyalty with respect to the Plan by at least the following actions or omissions:

(a)    failing to properly investigate the availability of, and give appropriate consideration to, better performing and lower-cost funds with comparable or superior performance as alternatives to the Plan Investments plagued with underperformance;

(b)     failing to evaluate and monitor on a regular basis the performance of the Plan Investments;

(c)     failing to recommend more prudent additions to the Plan Investments including better performing and less expensive  non-proprietary Plan Investments;

(d)     failing to implement and employ an ongoing process to monitor the performance, fees, and expenses of the Plan Investments;

(e)     exposing Plan participants to the ISTIF without their knowledge;

(f)     structuring the Schwab Account to limit equity purchases to Invesco-affiliated ETFs, and by failing to remove Invesco-affiliated fund choices when less costly alternatives were available as Plan Investments;

(g)     considering and being motivated in whole or in part by the promotion or success of the business of Defendant Invesco and its asset management business; and

(h)     failing to promptly remove the imprudent proprietary and/or affiliated Plan Investments.

118.   Through these actions and omissions, the Plan Sponsor Defendants and the Benefits Committee Defendants failed to discharge their duties with respect to the Plan: (A) solely in the interest of the participants and beneficiaries of the Plan, and for

the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A), 29 U.S.C. §1104(a)(1)(A); and (B) failed to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA §404(a)(1)(B), 29 U.S.C. §1104(a)(1)(B).

119.   As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally, and regardless of the losses incurred by Plaintiff or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Plan Sponsor Defendants and the Benefits Committee Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of these Defendants' breaches of the duties of loyalty and prudence.

## COUNT II

### Breach of Fiduciary Duties in Violation of ERISA §404(a)
### Against the Plan Sponsor Defendants
### for Failure to Monitor Other Fiduciaries

120.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

121.    The Plan Sponsor Defendants were and continue to be fiduciaries of the Plan under ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), because they were responsible for: (i) ensuring all proprietary investments offered as part of the Plan Investments were prudent, loyal, and in compliance with all rules of ERISA; (ii) appointing and removing members of the IBPC; (iii) monitoring the performance of IBPC members; (iv) delegating fiduciary authority under the Plan; and (v) making necessary changes to the Plan.

122.    As a fiduciary of the Plan, the Plan Sponsor Defendants were and continue to be required pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1), to act solely in the interest of the participants and beneficiaries of the Plan they served and (A) "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan," and (B) discharging their duties on an ongoing basis "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Consistent with these duties, the Plan Sponsor Defendants were required to ensure that the monitored fiduciaries were performing their fiduciary obligations, including those with respect to the investment and monitoring of Plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

123. To the extent the Plan Sponsor Defendants delegated fiduciary monitoring responsibilities to other fiduciary Defendants, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

124. The Plan Sponsor Defendants breached their fiduciary monitoring duties by, among other things:

(a)    failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Defendants' election to load the Plan with proprietary Plan Investments when superior non-proprietary investment alternatives were readily available elsewhere, as detailed herein;

(b)     failing to monitor the processes by which Plan Investments were chosen, evaluated and retained, which would have alerted a prudent fiduciary to the preferential treatment Defendants gave to Invesco-affiliated funds out of self-interest, and not based on the best interest of the Plan's participants;

(c)     failing to monitor the process by which Plan Investments were chosen, evaluated or retained, which would have alerted a prudent fiduciary of the excessive fees and/or underperformance of the proprietary Plan Investments;

(d)     failing to monitor their appointees to ensure that they considered availability of comparable non-Invesco funds, including lower-cost funds with similar strategies and similar or superior performance and/or less expensive, better-performing funds than the proprietary and/or affiliated Plan Investments; and

(e)     failing to remove fiduciaries whose performance was inadequate in that they continued to maintain costly and self-serving investments in the Plan, all to the detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class.

125.   As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiff and members of the Class have suffered substantial losses in the form of higher fees and/or lower returns on their investments than they would have earned by the prudent and loyal investment of Plan assets.

- 54 -

126.   Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), the Plan Sponsor Defendants are liable to disgorge all fees received from the Plan directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

## COUNT III

### Prohibited Transactions in Violation of ERISA §406(a)(1) (A), (C) and (D) Against Defendant Invesco, the Plan Sponsor Defendants, the Benefits Committee Defendants and the Investment Manager Defendants

127.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

128.   ERISA §406(a)(1), 29 U.S.C. §1106(a)(1) provides, in pertinent part, that a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect –

(A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

*        *        *

(C)    furnishing of goods, services, or facilities between the plan and a party in interest;

(D)    transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan . . .

- 55 -

129.   The Plan Sponsor Defendants and the Benefits Committee Defendants are fiduciaries of the Plan within the meaning of ERISA §3(21), 29 U.S.C. §1002(21) that caused the Plan to offer the proprietary and/or affiliated Plan Investments and to continue offering the Plan Investments as options in the Plan.

130.   As the employer of the named fiduciaries under the Plan, the corporate parent that wholly owns the Plan Sponsor, and the corporate parent that wholly owns the service providers for the Plan, Defendant Invesco is a party in interest under ERISA §3(14).

131.   As service providers to the Plan, the Investment Manager Defendants were parties in interest within the meaning of ERISA §3(14).

132.   The Plan Sponsor Defendants and/or the Benefits Committee Defendants caused the Plan to almost exclusively select proprietary Invesco products as the Plan Investments offered to Plan participants during and throughout the Class Period, even though the Plan Investments, as identified above, were plagued by needlessly high expenses and underperformance.

133.   Since the Investment Manager Defendants were subsidiaries of Defendant Invesco, Defendant Invesco and the Investment Manager Defendants must have known that those transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest.

134.   These transactions were for more than reasonable compensation, not selected solely in the interests of Plan participants and/or were on terms less favorable than could have been procured if the transactions were the product of arm's-length negotiations with outside investors.   As described throughout the Complaint, compensation paid to parties in interest for management of proprietary mutual funds and CITs was unreasonably high to promote the business of Defendant Invesco and its wholly-owned subsidiaries Defendant Invesco Advisers and Defendant Invesco Trust Co.  The Plan fiduciaries, all senior executives or officers of Defendant Invesco, acted in their own self-interest without consideration for Plan participants.   As a representative example, in June 2014, Plan fiduciaries steered participants invested in the Invesco Emerging Market Equity Trust, with an operating expense of 0.21%, into the Invesco Developing Markets mutual fund with an operating expense of 1.01% -- 80 bps higher even though the Developing Markets mutual fund had a track record of underperformance.  These Defendants failed to consider or select lower cost, non-proprietary investment alternatives, including those offered by unaffiliated investment managers with lower fees.

135.   By selecting the proprietary and/or affiliated Plan Investments as the virtually exclusive options in the Plan and by maintaining these as the options in the Plan, Defendant Invesco, the Invesco Plan Sponsor Defendants, the Benefits

Committee Defendants and the Investment Manager Defendants caused the Plan to engage in a prohibited transaction in violation of ERISA §406(a)(1) (A), (C) and (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D).

136.   As parties in interest, Defendant Invesco and the Investment Manager Defendants are liable for these violations of ERISA §406(a)(1) (A), (C) & (D), 29 U.S.C. §1106(a)(1) (A), (C) and (D) pursuant to ERISA §502(a)(3).

137.   As a result of these prohibited transactions, Defendant Invesco and the Investment Manager Defendants received, and Plaintiff and members of the Class paid, millions of dollars in the form of higher fees and lower returns on their investments than they would have without these prohibited transactions.

## COUNT IV

**Prohibited Transactions in Violation of ERISA §406(b)(1) and (3)
Against Defendant Invesco, the Plan Sponsor Defendants, the Benefits
Committee Defendants, and the Investment Manager Defendants**

138.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

139.   ERISA §406(b), 29 U.S.C. §1106(b), provides, in pertinent part, that a fiduciary with respect to a plan shall not:

(1) deal with the assets of the plan in his own interest or for his own account,

or . . .

- 58 -

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

140.   The Plan Sponsor Defendants and the Benefits Committee Defendants are fiduciaries of the Plan within the meaning of ERISA §§3(21) and 406(b)(1), 29 U.S.C. §§1002(21) and 1106(b)(1).

141.   The Invesco Plan Sponsor Defendants and the Benefits Committee Defendants dealt with the assets of a plan in their own interest or for their own account by selecting and maintaining the proprietary and/or affiliated Plan Investments despite their high fees and/or poor performance because Defendant Invesco received the financial benefit resulting from the performance of its wholly-owned subsidiaries.

142.   Defendant Invesco received consideration for its own account through the receipt of investment management fees paid from the Plan Investments in the Plan to its wholly-owned subsidiaries and/or the profits derived from the fees generated by its wholly-owned subsidiaries in violation of ERISA §406(b)(3), 29 U.S.C. §1106(b)(3).

143.   The Investment Manager Defendants were wholly-owned subsidiaries of Defendant Invesco during and throughout the Class Period.   As a result, the Investment Manager Defendants would have known that the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants, all senior executives and officers

of Defendant Invesco, were dealing with the Plan in their own interest or for their own account by selecting and maintaining proprietary and/or affiliated Plan Investments or that these fiduciaries received consideration for their own account by selecting and maintaining proprietary and/or affiliated Plan Investments.

144.   By selecting the proprietary and/or affiliated Plan Investments and by maintaining these as the options in the Plan, Defendant Invesco, the Invesco Plan Sponsor Defendants and the Benefits Committee Defendants caused the plan to engage in a prohibited transaction in violation of ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3).

145.   With respect to, at minimum, poor performing and expensive proprietary mutual funds and CIT Plan Investments, including but not limited to the Developing Markets Fund, Defendant Invesco, the Invesco Plan Sponsor Defendants, Benefits Committee Defendants, and the Investment Manager Defendants engaged in prohibited transactions as follows:

(a)   by causing the Plan to engage in transactions that they know or should know constitute direct or indirect transfers of the Plan's assets to, or use of the Plan's assets by or for the benefit of, parties in interest, in violation of 29 U.S.C. §1106(a)(1)(D);

(b)     by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan dealt with the assets of the plan in his own interest or for his own account in violation of 29 U.S.C. §1106(b)(1);

(c)     by causing the Plan to engage in the above conduct and omissions, in which a fiduciary to the Plan received consideration for its own personal account from any party dealing with the Plan in connection with a transaction involving the assets of the Plan, in violation of 29 U.S.C. §1106(b)(3); and

(d)     by causing the Plan to pay investment management fees, investment advisory fees, investment operation fees, or similar fees, which violated the terms of Prohibited Transaction Exemption 77-3.

146.   As parties in interest, Defendant Invesco and the Investment Manager Defendants are liable for these violations of ERISA §406(b)(1) and (3), 29 U.S.C. §1106(b)(1) and (3), pursuant to ERISA §502(a)(3).

147.   Pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), Defendant Invesco, the Invesco Plan Sponsor Defendants, the Benefits Committee Defendants and the Investment Manager Defendants are liable to disgorge all amounts and profits received as a result of these prohibited transactions, and such other appropriate equitable relief as the Court deems proper.

## COUNT V

### Co-fiduciary Liability Under ERISA §405
### Against the Plan Sponsor Defendants, the Benefits Committee
### Defendants, and the Investment Manager Defendants

148.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.   ERISA §405(a), 29 U.S.C. §1105(a), imposes liability on a fiduciary, in addition to any liability which he may have had under any other provision of ERISA, if:

(1)   he participates knowingly in or knowingly undertakes to conceal an act or omission of such other fiduciary knowing such act or omission is a breach;

(2)   by his failure to comply with ERISA §404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)   he knows of a breach by another fiduciary and fails to make reasonable efforts to remedy it.

150.   The Invesco Plan Sponsor Defendants, the Benefits Committee Defendants, and the Investment Manager Defendants were all fiduciaries of the Plan within the meaning of ERISA §402(a), 29 U.S.C. §1102(a), ERISA §3(21)(A), 29 U.S.C. §1002(21)(A), or both.

151.   Each of these fiduciaries knew of each breach of fiduciary duty alleged herein arising out of the imprudent investment of the assets of the Plan in the

- 62 -

proprietary and/or affiliated Plan Investments and the associated breaches.  Yet, they knowingly participated in fiduciary breaches, breached their own duties enabling other breaches, and/or took no steps to remedy other fiduciary breaches.

## COUNT VI

### Knowing Participation in a Fiduciary Breach or
### Violation of ERISA Pursuant to ERISA 502(a)(3)
### Against Defendant Invesco and the Investment Manager Defendants

152.   Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

153.   ERISA §502(a)(3), 29 U.S.C. §1132(a)(3) imposes liability not only on fiduciaries of the Plan but also on non-fiduciaries of the Plan who knowingly participate in fiduciary breaches or other violations of ERISA or the terms of the Plan. As such, the Investment Manager Defendants (even if they are not fiduciaries), can be held liable if either of them knowingly participated in the fiduciary breaches or violations of any fiduciary of the Plan.

154.   The Investment Manager Defendants and Defendant Invesco would have known that each of the other Defendants were fiduciaries of the Plan as these other Defendants either were senior Invesco executives and officers or were appointed by Invesco (or high level Invesco executives).  The knowledge of any such executives would be imputed to Invesco.

155.    Defendant Invesco and the Investment Manager Defendants would have been aware of the foregoing breaches and prohibited transactions, including:

(a)     the proprietary and/or affiliated Plan Investments had inferior investment performance;

(b)     the proprietary and/or affiliated Plan Investments charged excessive fees;

(c)     the fiduciaries who selected the Plan Investments had conflicts of interest;

(d)     the selection and continued offering of the proprietary and/or affiliated Plan Investments was not in the best interests of the participants, but instead the primary purpose of offering them as an investment option was to increase the assets under management, to increase the fees charged and the profits of Invesco, Invesco Advisers, Invesco Trust Co., and PowerShares; and

(e)     several proprietary Plan Investments they managed were invested in the ISTIF despite the obvious imprudence in doing so.

156.    Despite knowledge of these breaches and violations, Defendant Invesco and the Investment Manager Defendants proceeded to engage in the transactions and receive lucrative fees for their benefit.

157.   By knowingly participating in these breaches and violations, Defendant Invesco and the Investment Manager Defendants are subject to appropriate equitable relief including disgorgement of any profits, having a constructive trust placed on any proceeds received (or which are traceable thereto) and/or is subject to other appropriate equitable relief.

## ENTITLEMENT TO RELIEF

158.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled to sue each of the fiduciary Defendants pursuant to ERISA §502(a)(2), 29 U.S.C. §1132(a)(2), for relief on behalf of the Plan as provided in ERISA §409, 29 U.S.C. §1109, including for recovery of any losses to the Plan, the recovery of any profits resulting from the breaches of fiduciary duty, and such other equitable or remedial relief as the Court may deem appropriate.

159.   By virtue of the violations set forth in the foregoing paragraphs, Plaintiff and the members of the Class are entitled, pursuant to ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), to sue any of the Defendants for any appropriate equitable relief to redress the wrongs described above.

- 65 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring that each of the Defendants who are fiduciaries of the Plan have breached their fiduciary duties under ERISA;

B.      Ordering each fiduciary found to have breached his/her/its fiduciary duties to the Plan to jointly and severally restore all losses to the Plan that resulted from the breaches of fiduciary duty, or by virtue of liability pursuant to ERISA §405;

C.      Entering an order requiring: (a) the disgorgement of profit made by any Defendant; (b) declaring a constructive trust over any assets received by any breaching fiduciary in connection with his/her/its breach of fiduciary duties, or violations of ERISA, or any non-fiduciary Defendant who knowingly participated in that breach or violation; (c) requiring the Plan to divest itself of investments in the imprudent Plan Investments; and (d) any other appropriate equitable monetary relief, whichever is in the best interest of the Plan;

D.      Ordering, pursuant to ERISA §206(d)(4), 29 U.S.C. §1056(d)(4), that any amount to be paid to or necessary to satisfy any breaching fiduciary's liability can be satisfied, in whole or in part, by attaching their accounts in or benefits from the Plan;

E.      Removing any breaching fiduciaries as fiduciaries of the Plan and permanently enjoining them from serving as a fiduciary of any ERISA-covered plan in which Plaintiff or any member of the Class is a participant or beneficiary;

F.      Appointing an independent fiduciary, at the expense of the breaching fiduciaries, to administer the Plan and the management of Plan Investments and/or selection of investment options and/or to oversee the divestment of the Plan's investments;

G.      Ordering the Plan's fiduciaries to provide a full accounting of all fees paid, directly or indirectly, by the Plan;

H.      Awarding Plaintiff and the Class their attorneys' fees and costs pursuant to ERISA §502(g), 29 U.S.C. §1132(g), the common benefit doctrine and/or the common fund doctrine;

I.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest;

J.      Awarding such equitable, injunctive or other relief as the Court may deem appropriate pursuant to ERISA §502(a)(3) or any relief to which Plaintiff and the Class are entitled to pursuant to Fed. R. Civ. P. Rule 54(c); and

    K.      Awarding such equitable, injunctive or other relief as the Court may

deem just and proper.

DATED: September 7, 2018      ROBBINS GELLER RUDMAN
        & DOWD LLP
      JOHN C. HERMAN
       (Georgia Bar No. 348370)
      CARLTON R. JONES
       (Georgia Bar No. 940540)

                     */s/ John C. Herman*
              JOHN C. HERMAN

      3424 Peachtree Road, N.E., Suite 1650
      Atlanta, GA  30326
      Telephone:  404/504-6500
      404/504-6501 (fax)
      jherman@rgrdlaw.com
      cjones@rgrdlaw.com

      ROBBINS GELLER RUDMAN
        & DOWD LLP
      SAMUEL H. RUDMAN
      (*admitted pro hac vice*)
      EVAN J. KAUFMAN
      (*admitted pro hac vice*)
      JORDAN D. MAMORSKY
      (*admitted pro hac vice*)
      58 South Service Road, Suite 200
      Melville, NY  11747
      Telephone:  631/367-7100
      631/367-1173 (fax)
      srudman@rgrdlaw.com
      ekaufman@rgrdlaw.com
      jmamorsky@rgrdlaw.com

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
  (Georgia Bar No. 262062)
WILLIAM W. STONE
  (Georgia Bar No. 273907)
DAVID A. WEISZ
  (Georgia Bar No. 134527)
40 Powder Springs Street
Marietta, GA  30064
Telephone: 470/632-6000
770/200-3101 (fax)
michaelf@johnsonfistel.com
williams@johnsonfistel.com
davidw@johnsonfistel.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of September, 2018, a true and correct copy of the foregoing was served via CM/ECF filing on all counsel of record.

*/s/ John C. Herman*

JOHN C. HERMAN
ROBBINS GELLER RUDMAN
& DOWD LLP
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA 30326
Telephone: (404) 504-6500
Facsimile: (404) 504-6501
jherman@rgrdlaw.com